## BLAGGE v. BALCH.

## BROOKS v. CODMAN.

ERROR TO THE SUPREME JUDICIAL COURT OF THE STATE OF
MASSACHUSETTS.

## FOOTE v. WOMEN'S BOARD OF MISSIONS.

ERROR TO THE SUPERIOR COURT OF THE COUNTY OF NEW HAVEN,
STATE OF CONNECTICUT.

Nos. 177, 284, 207. Argued and submitted March 24, 25, 1896. — Decided April 13, 1896.

The proviso in the act of March 3, 1891, c. 540, 26 Stat. 908, "That in all
cases where the original sufferers were adjudicated bankrupts the awards
shall be made on behalf of the next of kin instead of to assignees in bank-
ruptcy, and the awards in the cases of individual claimants shall not be
paid until the Court of Claims shall certify to the Secretary of the
Treasury that the personal representative on whose behalf the award is
made represents the next of kin, and the courts which granted the ad-
ministrations, respectively, shall have certified that the legal representa-
tives have given adequate security for the legal disbursement of the
awards," purposely brought the payments thus prescribed within the
category of payments by way of gratuity and grace, and not as of right
as against the government.

Congress intended the next of kin to be beneficiaries in every case; and the
express limitation to this effect excludes creditors, legatees, assignees
and all strangers to the blood.

The words "next of kin," as used in the proviso, mean next of kin living at
the date of the act, to be determined according to the statutes of distri-
bution of the respective States of the domicil of the original sufferers.

The said act of March 3, 1891, c. 540, 26 Stat. 908, clearly indicates the judg-
ment of Congress that the next of kin, for the purposes of succession,
should be the beneficiaries, as most in accord with the theory of the
appropriations.

THESE are writs of error to review judgments of the Supreme
Judicial Court of Massachusetts in Nos. 177 and 284, and a
judgment of the Superior Court of the county of New Haven,
Connecticut, in No. 207.

Plaintiffs in error in No. 177 are administrators *de bonis non*

with the will annexed of the estate of Crowell Hatch, deceased, late of Roxbury, Massachusetts, and defendant in error is administrator *de bonis non* with the will annexed of the estate of Henry Hatch, deceased.

Crowell Hatch died in the year 1805, leaving three daughters and one son, Henry Hatch. By his will, all his property was given in equal shares to the four children. Of each of the three daughters there are descendants now living. The son died leaving a widow but no issue, and left by his will the residue of his estate to his widow, who did not afterwards marry. Crowell Hatch was never bankrupt and his estate and the estates of his four children have always been and are solvent. Plaintiffs in error as administrators of the estate of Crowell Hatch have received from the United States certain moneys for the loss of the brig Mary, being one of the claims on account of the spoliations committed by the French government prior to July 31, 1801, which were reported to Congress by the Court of Claims pursuant to the statute of the United States of January 20, 1885, 23 Stat. 283, c. 25, and for the payment of which Congress made appropriation by the statute of March 3, 1891, 26 Stat. 862, c. 540. By the statutes of Massachusetts in force when Crowell Hatch died, his estate, after the payment of debts and the expenses of administration, would have been distributed, if intestate, equally among his children. Laws of Massachusetts, Stat. 1789, c. 2, v. 2, p. 30; Stat. 1805, c. 90, §§ 1 and 2, v. 4, p. 337.

The probate court in and for the county of Norfolk, in which proceedings were pending, ordered a partial distribution of the fund of nine sixteenths among the descendants of the three daughters and of three sixteenths to the administrator of Henry Hatch, the son. From this order an appeal was taken to the Supreme Judicial Court, and the case reserved for the full court, by which the decree appealed from was affirmed. 157 Mass. 144.

In No. 284, William Gray, as administrator *de bonis non*, with the will annexed of the estate of William Gray, who was a sufferer from the French spoliations, filed his bill in equity in the Supreme Judicial Court of Massachusetts for instruc-

tions as to the disposition of a fund which had been paid to him under the act of Congress of March 3, 1891. On his death, pending the cause, Robert Codman succeeded to the administration and was substituted as complainant. All the living legatees and next of kin and the representatives of such as were deceased were made parties defendant. The case was heard by a single judge of the Supreme Judicial Court of Massachusetts and reported by him to the full court, which entered a final decree that the funds in the hands of the complainant should be " paid over as assets of the estate of William Gray, the elder, and as passing under his will to the residuary legatees named therein." 159 Mass. 477.

William Gray died November, 1825, leaving five sons, William R., Henry, Francis. C., John C. and Horace, and one daughter, Lucia G. Swett. He left a will by which, after a specific legacy to the daughter and a conditional legacy to each son, he gave the residue to his five sons, excluding the daughter. The fund in question, if it falls to the estate at all, is part of the residue. William R. died in 1831, intestate, leaving four children him surviving, one of whom died in 1880 leaving five children. In 1829 Henry assigned his interest in his father's estate to his four brothers, and died in 1854 leaving ten children. Francis C. died in 1856 and John C. in 1881, testate, but without issue. Horace died in 1873, intestate, leaving five children. In 1847 he assigned all his property under the insolvent laws of Massachusetts to Hooper, Bullard and Coffin, as assignees for creditors, and of these assignees two survive and are parties. Mrs. Swett died in 1844. She had had four children, of whom William G. died in 1843, leaving a daughter surviving; John B. died in 1867, leaving a daughter surviving; Samuel B. died in 1890, leaving five children; and one child, Mrs. Alexander, still survives.

The representatives of the three brothers, William R., Francis C. and John C., and the assignees of Horace, contended that the fund passed by the will of William Gray, and should be paid to them in equal proportions as representing four of the five residuary legatees, and as being assignees of the fifth son, Henry. The individual descendants of the brothers, except

those of Henry, made no contrary claim, and by their answers either took the same position or admitted the allegations of the bill and submitted the questions to the court.

The representatives and descendants of Henry Gray insisted that the fund did not pass under the will, but was a new and subsequent gift in favor of the next of kin of William Gray ; that it should go to the nineteen grandchildren of William Gray, excluding the great grandchildren, namely, the three children of William R., who survived at the date of the act of Congress, the ten children of Henry, the five children of Horace, and Mrs. Alexander, the one surviving child of Mrs. Swett; and that they were entitled to ten nineteenths of the fund distributed per capita among the grandchildren.

The representatives and descendants of Lucia G. Swett also contended that the fund did not pass under the will and was a subsequent gift in favor of the next of kin of William Gray, but they insisted that in the distribution among the next of kin of William Gray, to be ascertained at the date of the passage of the act, the issue of the deceased children should take by right of representation the shares of their parents according to the statute of distributions, or that the fund should be distributed among the representatives of the next of kin to be ascertained at the death of William Gray, the elder. Distributed *per stirpes*, they claimed for the children and grandchildren of Mrs. Swett one fourth of the fund, one sixteenth to Mrs. Alexander, one sixteenth to the daughter of William G., one sixteenth to the daughter of John B. and one eightieth to each of the five children of Samuel B., making another sixteenth ; or that, taking the distribution as of the date of the death of William Gray, the administrator of the estate of Mrs. Swett was entitled to one sixth part of the fund as the representative of one of the six children of William Gray, surviving him.

In No. 207 the facts appeared to be these : In 1797 the firm of Leffingwell and Pierrepont owned a ship and cargo which were seized by a French privateer in June of that year and became the subject of a French spoliation claim. William Leffingwell, the senior partner, lived in New Haven, Connecti-

cut, and died testate in 1834. His estate was finally settled in 1844, and no mention of his interest in this claim was made in his will or in the distribution of his estate. The surviving partner lived in New York and died testate in 1878. His executor presented the claim to the Court of Claims in 1886, and a favorable decision was secured in 1888, and an appropriation made by the act of March 3, 1891. In 1886, administration *de bonis non* on the estate of William Leffingwell was taken out by Oliver S. White in the probate court for the district of New Haven, Connecticut, and the administrator has received from the representatives of the surviving partner half the net proceeds of the award. The probate court, in settling the question of the administration *de bonis non*, treated the fund as part of the residuary estate of the testator, and ordered its distribution to the residuary legatees under his will and their representatives or successors. An appeal was taken to the Superior Court, which, in conformity to the advice of the Supreme Court of Errors, 62 Connecticut, 347, affirmed the decree of the court of probate.

William Leffingwell left as his next of kin him surviving the four children named in his will, Mrs. Street, Mrs. Williams, Lucius W., Edward H., and the children of his deceased son William C. Mrs. Street died testate and solvent in 1878; Mrs. Williams and Edward H. died testate and without issue; and the next of kin of William Leffingwell living on March 3, 1891, were, as was agreed, according to the statute of distributions of Connecticut, (1) plaintiffs in error, the grandchildren of Mrs. Street; (2) six children of Lucius W., a grandson of Lucius W., and the widow of a deceased son of Lucius W.; (3) a son of William C. and three grandchildren of said William C. The probate decree ordered the fund distributed among the five residuary legatees named in the will of William, "one fifth thereof to the executors or administrators of Caroline Street, a daughter of said deceased." If this one fifth were considered as general assets of Mrs. Street's estate, it went to the residuary legatee under her will, the Women's Board of Missions, otherwise it belonged to plaintiffs in error as through her the next of kin of William Leffingwell on one line of

descent. Plaintiffs in error claimed that on March 3, 1891, when the act of Congress was passed, they were entitled to their due shares *per stirpes* of the fund, to wit, one third thereof, there being only three of the five children of William Leffingwell who survived him, whose descendants were living at that date.

This court, before argument began, ordered that three hours be allowed counsel for the plaintiffs in error in the argument of these cases, and that three counsel be heard on each side. As it is manifestly impossible to find room for all these arguments in the report of the case, the reporter confines himself to reporting the arguments in the first case in order on the docket, and only upon the points on which the decision of it turned.

*Mr. George A. King* (of Boston) for plaintiffs in error in *Blagge* v. *Balch*, No. 177.

Is the fund received by the plaintiffs in error, in their capacity of administrators, to be treated (*a*) as a part of the estate of Crowell Hatch; or (*b*) as an appropriation made for the direct benefit of the next of kin of the said decedent?

The Supreme Court of the District of Columbia has determined that the grant is not to the estate of the decedent but to the next of kin. *Gardner* v. *Clarke*, 20 Dist. Col. 261. The Supreme Court of Pennsylvania has also so decided. *In re Clement's Estate*, 150 Penn. St. 85; *Appeal of Bailey*, 160 Penn. St. 391.

The Supreme Court of Massachusetts cannot be cited in favor of either proposition. The dissenting opinion in *Codman* v. *Brooks*, 159 Mass. 477, written by the Chief Justice, takes the ground that the creditors of the original sufferer are to be excluded from receiving the money. If this be so, it would seem to follow, necessarily, that the fund is no part of the estate of the original sufferer, but a gift to his next of kin.

The Supreme Court of Connecticut stands alone in the opinion that the fund is to all intents and purposes a part of

the estate of the original decedent. *Leffingwell's Appeal*, 62 Connecticut, 347.

We are of opinion that the fund goes to the next of kin living at the passage of the act, for the following reasons, in addition to those given in the above cited cases.

I. If the awards are to the next of kin, there seems to be no escape from the conclusion that they are to be paid to such next of kin as are represented by the administrators. This representation is to be established by evidence sufficient to enable the Court of Claims to grant its certificate. It is not that representation which inheres in the office of administrator, for such representation only applies to the decedent. Inasmuch as it is a fact to be proved by evidence it is not a representation that grows out of the nature of the office. In this case, the administrators of Crowell Hatch do not now and never did represent Henry Hatch in law or fact. Having died long since, he cannot be represented by these administrators.

The only next of kin who can be represented, who can authorize anybody to represent them, are the *living next of kin.*

The next of kin of the original sufferer are frequently widely scattered. The practice in the Court of Claims has uniformly been, as it necessarily must be, to require proof that all these persons concur in appointing the administrator as their representative. That was done in this case. The living next of kin are, therefore, the persons represented by the administrators, and are, therefore, the persons entitled to the fund.

II. It may be suggested, also, that it is hardly reasonable to suppose that Congress meant that one set of men should elaborately provide for this representation in order that they might be excluded from the fund for the benefit of other persons.

III. The purpose of the act being to discharge an equitable obligation and make an award to the living persons descended from those who lost their property for the benefit of the government, the purpose of the proviso was plainly to prevent any payment where there were no representatives of the original sufferer to receive the fund.

There are a number of cases where there are appropriations in this act and where no money has been or ever can be obtained because the family of the loser has become extinct, and there are no living persons to make proof of representation and get a certificate from the Court of Claims.

IV. Of the four children of Crowell Hatch, there are living descendants of three, and they are the only next of kin. It was wholly by representing these that the administrators were able to obtain the money awarded. Henry Hatch, the petitioner's decedent, left no issue. It would have been impossible to obtain from the government one dollar on his · account.

*Mr. Francis V. Balch* and *Mr. Felix Rackemann*, for defendant in error in No. 177, submitted on their brief.

In seeking for the key note of the proviso, it is plain that Congress was dealing with the settlement of claims nearly one hundred years old, and that numbers of the original sufferers had become bankrupt (many driven into bankruptcy by these very spoliations), and no single survivor of the original sufferers remained.

Congress had had the "Alabama Claims" distribution as an object lesson, where the disputes with assignees in bankruptcy, and the practical difficulties of proper distribution among creditors in insolvency after the lapse of years, stood prominent as danger signals. If creditors in bankruptcy of "Alabama" claimants were difficult to ascertain and reach, how would it be with the bankruptcy files of 1800, and where would the labor and the litigation end?

The proviso only applies to cases where the original sufferer was bankrupt. No part of it is intended to operate in any other case. All other cases stand on the word "pay" and the designation of the payees in the schedule.

Assume for the moment that the proviso applies to the present and not to future appropriations.

The proviso is one sentence, broken only by commas. It begins, "provided that in all cases where the original sufferers

were adjudicated bankrupts." Here is a distinct and technical description of a particular catastrophe well known to every one — lawyer or layman. Beginning in this way, with special emphasis placed upon this particular event, the whole proviso would be expected to relate to and be applicable to this event unless some other is distinctly introduced. If a new class of events were to be dealt with in the rest of the sentence it should naturally be clearly demarked, as if, for instance, it said, "and in cases where the original sufferer was not adjudged bankrupt," such and such shall be the rule. The sentence, however, goes on, "and the awards in the cases of individual claimants shall not be paid until," etc. There is no sensible construction which can be given to "individual claimants" which will make it distinct and marked off from cases where the original sufferer was adjudicated bankrupt.

Would not assignees of bankrupts be individual claimants? Would not the next of kin on whose behalf the award is to be. made in cases of bankruptcy be individual claimants?

We submit that the words "and in the cases of individual claimants" mean simply this, in the case of "*the* individual claimants," or in the case "of *each* individual claimant" who was so adjudicated, *i.e.*, that in each case where there was bankruptcy of the original sufferer or claimant, there shall be an investigation, to make sure that the party prosecuting the claim is acting for the next of kin, and not for the creditors. This is further shown by the word "*respectively.*" This makes the whole consistent and clear, and is made further apparent by the differences in the operative words in the two parts of the sentence. In the leading part of the sentence the words are, the "awards shall be *made*," but in the second part of the sentence the language is "and . . . the awards shall not be *paid*." This is natural if the latter part of the sentence provides merely an additional precaution affecting the cases spoken of in the earlier part; but it would be nothing short of extraordinary if the sentence should provide for the few cases of bankruptcy by mandatory words, "The awards shall be made," and should then proceed to dispose of the immeasurably larger and more important class of non-

bankrupts, not by saying in such cases, too, the awards "shall be made on behalf of next of kin," but by a merely negative administrative provision as to their payment when made. The reason for such a precaution in case of bankruptcy becomes apparent when it is remembered that the administrator or executor of the assignee might claim to receive the award on behalf of the next of kin, not being expressly excluded as the assignee himself is, *Richards* v. *Maryland Insurance Co.*, 8 Cranch, 84. Such administrator or executor might well be hostile to the next of kin, and even if the award were to the executor or administrator of the bankrupt sufferer he might be under the dominance of the creditors.

Another consideration leads irresistibly to the same conclusion. Had it been the intention in all cases to make the "payment" as a gratuity to the next of kin, it would have been the simplest thing possible to have said so. How strange, if such was the intent, to begin by laying special stress upon the peculiar case of original sufferers who were adjudicated bankrupts. Such a case would be the exception, not the general rule. As well might the law say that every man who carries a concealed *revolver* shall be subject to a fine of five dollars, and every man who carries a concealed *weapon* shall be subject to a fine of five dollars.

Legal propositions do not ordinarily have the certainty of mathematical conclusions, but it seems almost a mathematical certainty that the latter part of this proviso could not have been intended to cover all cases of claimants. If not, what class was it intended not to cover?

It will be said it was intended to cover all but the "corporate" claimants, and that as a corporation could not have been adjudicated bankrupt, this construction leaves the bankrupt original sufferers to make one class, the solvent individual sufferers another class, and the corporate sufferers a third class, the provisions of the latter part of the proviso embracing all the bankrupts and all the individual non-bankrupts, it being in the case of bankrupts an additional precaution, and in the case of the non-bankrupts the sole precaution.

This is a possible construction, but it gives no explanation

of the emphasis laid on the case of bankruptcy, or of the resulting inanity of providing clearly for the few, and ambiguously and imperfectly for the many, or of the improbability of any effort to produce in this cumbrous and dubious way an effect which only needed a word or two. Surely, to make an executor of a will take on behalf of next of kin (and there were many cases of executors among the claims appropriated for, our own being a case of administration with will annexed), it needs as strong language as to make an administrator of a bankrupt or of his assignee take on behalf of next of kin.

The marginal note to the proviso, though of no great weight, shows that the proviso was understood merely to cover cases of bankruptcy.

If it is considered forced to read "individual claimants" as "*the* individual claimants," thus making the proviso to require a certificate in each individual case of a bankrupt sufferer, which we submit is the most natural and must have been the real meaning, we may read it as applying to all cases where the administrators or executors, who are to take the bankrupt claim on behalf of next of kin are "individuals," it not being considered necessary to require a certificate in the case of corporate administrators or executors, as corporations would only be admitted to such trusts where clearly responsible. There are three such cases, at least, among those for which appropriations are made: The Safe Deposit and Trust Company, Baltimore, the Penn. Company and the Union Trust Company, New York. Or "individual claimants" may be intended to designate the "next of kin" who are substituted for creditors by the first part of the sentence, and in a certain loose sense may be considered as "individual" claimants as contradistinguished from an assignee claiming not for himself but others. In this sense again "individual claimants" would cover the cases of bankruptcy and no more.

But the proviso is not applicable at all to the present appropriations.

This appears from its use of the word "awards," from the evident belief on the part of the framers of the law that they

had weeded out all cases of bankruptcy from the present appropriations, and by the use of the future tense.

This was so held in a well considered case in the Court of Claims. *Henry* v. *United States*, 27 C. Cl. 142.

If for the sake of argument the case at bar be conceded to be one intended to be covered by the words "individual claimants," still the question recurs, What does the proviso provide in such case?

It provides a partial protection against creditors but does not attempt to protect against them absolutely. It does not attempt to fix the class who are to take absolutely.

The shield is applied to a broader class, it extends to cases where the original sufferer was not bankrupt; but the shield is not itself changed.

That protection is intended against creditors generally may, for the argument, be granted, but how thorough protection?

Where the original sufferer was bankrupt, and his assignee claimed, the award, we have seen, was to be changed so as to go to the executor or administrator.

Here no change is attempted in the award, but certain partial and preliminary precautions are to be taken before paying the award.

It is to appear, in substance, that debts are out of the way, that the heirs or legatees moved in getting the administration, and that the administrator is under suitable bonds.

If the proviso does operate as though it said the awards are to be on behalf of next of kin in all cases except those of corporate original sufferers, it uses "next of kin" in a loose sense, to cover all claimants under a solvent original sufferer.

The statute is wholly colorless as to any intent to set off next of kin against legatees. Can it be supposed for a moment that an executor could not be a claimant? Where there was a will there could be no administrator except with will annexed. The case at bar is such. Does the statute say that in all such cases the award shall be changed and made to an agent of the kin? Certainly not. What the statute does, upon the present assumption, is to set off kin as representing

both heirs and legatees against creditors, the most conspicuous
class, " next of kin," being put forward for the whole.

If it be said that the words "next of kin" cannot be so
broadened, how narrow shall they be made? As narrow as
in *Swazey* v. *Jaques*, 144 Mass. 135, cutting off nephews if
there was a brother? Surely not. And does not the impossi-
bility of this show that the words were used in a loose and
general sense, not the technical one? Why infringe farther
than necessary upon the doctrine of ownership by original
sufferers?

But suppose for a moment this statute uses "next of kin"
as opposed both to legatees and creditors, all it requires is
that there should be next of kin and that the administrator
should represent them.

The statute in that case does indeed say that the adminis-
trator must represent next of kin, but it does not say he must
represent *living* next of kin, nor if it could be so construed
does it say he must represent such exclusively. It may well
be that Congress intended that if there were no living kin
there should be no payment of a claim likely to prove es-
cheated.

In the case at bar, the administrators could truly say they
represented living next of kin, but they could not truly say
they represented living next of kin exclusively. They repre-
sented those claiming under Henry Hatch, as well. How and
when did they cease to represent us? They could truly say
they represented next of kin exclusively, if, as is here con-
tended, those living at the death of Crowell Hatch were the
next of kin intended by the statute. It was a fraud on the
Court of Claims if they stated they represented *living* next of
kin exclusively.

But whatever the password was, it has been given. The
Court of Claims has lifted the gate and we are through. Now
the law must have its course, our law, the Massachusetts law,
the law which these administrators have given bonds to fol-
low, and which bonds they were obliged to certify to the
Court of Claims in order to get this very money.

But if " next of kin " means kin strictly, and that such kin

alone are to take, then it means kin living at the decease of the original sufferer.

The period of decease is always, in the absence of clear intent to the contrary, the period at which heirs or next of kin are determined. Jarman on Wills, 5th Amer. ed. 670.

The mind of the draftsman was turned to the past, to the original sufferer; did it at once turn to the present on the mention of next of kin?

It will be said that a gratuity cannot be given to a dead person. In the first place it is not a case of gratuity; and in the second place, even if it were a gratuity, the beneficial donees who, it is admitted, must, in such case be living, may be as well designated " those now entitled had it formed part of the sufferer's estate ". (which is equivalent to next of kin at death of the sufferer) as " those now entitled had the sufferer died in the state of his domicil possessed of the property, intestate, and without surviving husband or wife." There is no word in the whole proviso which implies that *now living, next of kin,* were meant.

Granting, then, that if Crowell Hatch had willed away his property from his kin, the kin and not legatees would have taken, yet here he willed to his kin, his four children, of whom Henry was one, and whose administrator must take a share in either aspect.

Suppose it is a gratuity, — why infringe farther than is necessary upon the rights of the original sufferers to have the funds treated as part of their estates?

Even if the court should believe that in some vague and general way the next of kin living at the date of the act were intended to take, the intent is not so expressed that it can so take effect.

The meaning of this statute cannot be guessed at.

Suppose it were a will where, if ever, *intent* is the polar star of construction. First comes a clear grant to pay a debt which has passed into judgment, then comes this ambiguous proviso. It could not operate to cut down a clear grant.

There is certainly nothing within the four corners of this instrument which shows such intent in any clear form; quite

a contrary intent is shown.  Beyond and outside the instrument, the surroundings and motives of the actors are more than ever convincing that no such intent existed.  If there were an intent to pay to an administrator under bonds in our courts a fund which he was not to treat as assets, and which yet was to be secured by his bond, this was an inconsistent and impossible intent.

It is not denied that an executor in Massachusetts may, under the operation of the statute law, collect, in certain cases, rents for which he will be held liable on his bond, though not strictly assets, nor that he may not collect life insurance moneys belonging to the widow *where the contract was with the deceased*, nor that he may not be empowered by statute to collect compensation for death for the benefit of next of kin.  But it cannot plausibly be claimed that these administrators would be liable on their bonds, or that the probate court would have jurisdiction in respect to these amounts unless they were assets.  Special legislation would have been requisite in Massachusetts (and probably in every other State where any original sufferer was domiciled), to carry out the intent of gratuity to living next of kin collected by executors and administrators of the original sufferers.  Surely, plain terms would have been employed if such an unusual purpose had been entertained.

*Mr. William Warner Hoppin* for plaintiffs in error in *Foote* v. *Women's Board of Missions*, No. 207, submitted on his brief.

*Mr. James H. Webb* and *Mr. John W. Alling* for defendants in error in No. 207.

*Mr. Jabez Fox*, (with whom was *Mr. W. G. Russell* on the brief,) *Mr. William Gray Brooks* and *Mr. Harvey D. Hadlock* for plaintiffs in error in *Brooks* v. *Codman*, No. 284.

*Mr. Joseph B. Warner* for defendants in error in No. 284.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The French spoliation claims arose from the depredations of French cruisers upon our commerce and from the judgments of French prize courts, and could have been enforced against France only by our government, either by diplomacy or by war. In the negotiations leading up to the treaty of September 30, 1800, 8 Stat. 178, these claims of individuals were presented by our commissioners to France, who in turn asserted claims as a nation against this government for failure to comply with treaty guaranties and action in contravention of treaty. The sufferers from the French spoliations have constantly contended that, by that treaty as finally agreed on and ratified, all claims for indemnity were mutually renounced, and that, therefore, an obligation to indemnify them rested upon our government.

January 20, 1885, an act of Congress was approved, 23 Stat. c. 25, 283, providing that " such citizens of the United States, or their legal representatives, as had valid claims to indemnity upon the French government arising out of illegal captures, detentions, seizures, condemnations and confiscations prior to the ratification of the convention between the United States and the French Republic concluded on the thirtieth day of September, eighteen hundred, the ratifications of which were exchanged on the thirty-first day of July following," might apply to the Court of Claims within two years from the passage of the act, and " that the court shall examine and determine the validity and amount of all the claims included within the description above mentioned, together with their present ownership, and, if by assignee, the date of the assignment, with the consideration paid therefor," and " they shall decide upon the validity of said claims according to the rules of law, municipal and international, and the treaties of the United States applicable to the same, and shall report all such conclusions of fact and law as in their judgment may affect the liability of the United States therefor," and that " such finding and report of the court shall be taken to be merely advisory as to the law and facts found, and shall not conclude either the claimants or Congress; and all claims not finally presented to said court within the period of two years limited by this

act shall be forever barred; and nothing in this act shall be construed as committing the United States to the payment of any such claim."

Proceeding to advise under this act, the Court of Claims, in many cases, found with regard to claims therein presented that the original sufferers had valid claims to indemnity upon the French government prior to the convention of 1800; that these claims were relinquished to France by the United States government by that treaty in part consideration of the relinquishment of certain national claims of France against the United States; and that this use of the claims raised an obligation under the Constitution to compensate the individual sufferers for their losses. *Gray* v. *United States*, 21 C. Cl. 340; *Holbrook* v. *United States*, 21 C. Cl. 434; *Cushing* v. *United States*, 22 C. Cl. 721.

As to the present ownership of the claims the court in *Buchanan* v. *United States*, 24 C. Cl. 74, 81, said:

· "What it has endeavored to do is to ascertain the person in whom the legal title and custody exist; that is to say, the legal representative who in an ordinary suit at law or proceeding in equity would be deemed the proper party to maintain an action for the recovery of similar assets of the original claimants. In the cases of individual owners or underwriters the court has required a present claimant to file his letters of administration and prove to the satisfaction of the court that the decedent whose estate he has administered was the same person who suffered loss through the capture of a vessel. . . .

"In cases of partnership the court has required evidence of survivorship, and has allowed only the administrator of the survivor to prosecute the claim.

"In cases of bankruptcy, it has held, under the decisions of the Supreme Court, that the claim passed to the assignee, and that on his death it passed to his administrator. . . . .

"And where the evidence has shown the bankrupt estate to be still unsettled, the court has held the legal title to be still vested in the assignee.

"In cases of incorporated companies no longer in existence,

the court has required only the decree of a court of compe-
tent jurisdiction transferring their rights of action to the
hands of a receiver.   .   .   .

"In none of these cases has the court assumed to determine
who were the next of kin of a deceased claimant; nor whether
there are any; nor in what proportion were the several inter-
ests of partnership owners; nor whether creditors or descend-
ants have the superior equity, nor whether the children of a
bankrupt are entitled to a residue of his estate; nor whether
the receiver of a defunct corporation represents creditors or
stockholders.   In other words, the court has not assumed to
determine what persons are legally or equitably entitled to
receive the money which Congress may hereafter appropriate
for the discharge of these claims.

"When the validity of a claim against France and the
relinquishment thereof by the United States under the second
article of the treaty of 1800, and the amount in which the origi-
nal claimant suffered loss, have been determined and reported,
Congress will be in possession of all the facts which this court
under its present restricted jurisdiction can possibly furnish.
It will then be within the legislative discretion —   .

"(1) To ascertain through the proper committees who are
the persons who should receive the money; or

"(2) To provide for the ascertainment of that fact by addi-
tional legislation; or

"(3) To confide the money to the administrators and re-
ceivers who, with the exception of a few still existing corpora-
tions, constitute the present claimants, trusting that they and
the courts of which they are the officers and agents will dis-
tribute the funds among the creditors or next of kin of the
original claimants.

"The decisions in these spoliation cases are not judgments
which judicially fix the rights of any person; and the obliga-
tions of the government are so far moral and political that
they cannot be gauged by the fixed rules of municipal law for
the measures of legal damages."

These advisory conclusions having been reported to Con-
gress, the act of March 3, 1891, 26 Stat. 862, 897, 908, c. 540,

was passed making appropriations to pay certain enumerated claims with the following proviso :

"*Provided*, That in all cases where the original sufferers were adjudicated bankrupts the awards shall be made on behalf of the next of kin instead of to assignees in bankruptcy, and the awards in the cases of individual claimants shall not be paid until the Court of Claims shall certify to the Secretary of the Treasury that the personal representatives on whose behalf the award is made represent the next of kin, and the courts which granted the administrations, respectively, shall have certified that the legal representatives have given adequate security for the legal disbursement of the awards."

The cases in hand turn upon the construction of this proviso, and while it is not denied that Congress had the power to enact that the next of kin should take irrespective of the legal title to the assets of the estate of the original sufferers, it is important, in arriving at a conclusion as to whether and to what extent that was done, to refer to the view taken by Congress in respect of the ground of the appropriations as indicated by its action.

Notwithstanding repeated attempts at legislation, acts in two instances being defeated by the interposition of a veto, no bill had become a law, during more than eighty years, which recognized an obligation to indemnify, arising from the treaty of 1800, and the history of the controversy shows that there was a difference of opinion as to the effect of that treaty. 2 Whart. Int. Law, § 248, p. 714; Davis, J., *Gray* v. *United States, supra.* Under the act of January 20, 1885, the claims were allowed to be brought before the Court of Claims, but that court was not permitted to go to judgment. The legislative department reserved the final determination in regard to them to itself, and carefully guarded against any committal of the United States to their payment. And by the act of March 3, 1891, payment was only to be made according to the proviso. We think that payments thus prescribed to be made were purposely brought within the category of payments by way of gratuity, payments as of grace and not of right.

In *Comegys* v. *Vasse,* 1 Pet. 193, the United States had

stipulated with Spain that they would assume and pay certain claims of their citizens against Spain, and an award was made in favor of Vasse, one of the claimants, by a commission appointed as stipulated to examine and adjudicate the claims. Vasse had in the meantime become bankrupt, and the assignment in bankruptcy was held to carry the claim with it.

In *Heard* v. *Williams*, 140 U. S. 529, *Comegys* v. *Vasse* was followed, and applied to the awards of the Alabama Claims Commission. The United States had demanded and received indemnity for losses sustained by their citizens, and had recognized as valid the class of claims to which the particular claim belonged, and had created a court to adjudicate thereon. It was held that the claim passed to the assignee in bankruptcy, and that payment of awards so made could not be regarded as a mere gratuity.

In *Emerson's Heirs* v. *Hall*, 13 Pet. 409, 413, Chew, the collector, Emerson, the surveyor, and Lorraine, the naval officer, of the port of New Orleans, prosecuted a vessel to condemnation for violation of the laws of the United States prohibiting the slave trade, and the District Court allowed their claim to a portion of the proceeds of the sale of the property, but this decree was afterwards reversed, and the whole proceeds adjudged to the United States. 10 Wheat. 312. Emerson and Lorraine afterwards died, and March 3, 1831, 6 Stat. 464, Congress passed an act "for the relief of Beverly Chew, the heirs of William Emerson, deceased, and the heirs of Edwin Lorraine, deceased," which directed the portion of the proceeds claimed to be paid over to Chew, "and the legal representatives of the said William Emerson and Edwin Lorraine, respectively;" and under authority of which the sums which had been adjudged to these officers were paid to them as provided. One of the creditors of Emerson claimed the sum so paid to his legal representatives as assets for the payment of his debts, but it was held that the payment to the heirs was rightfully made, and that the sum could not be considered in their hands as assets for the payment of the debts of their father. Mr. Justice McLean, delivering the opinion of the court, said: "A claim having no foundation in

law, but depending entirely on the generosity of the government, constitutes no basis for the action of any legal principle. It cannot be assigned. It does not go to the administrator as assets. It does not descend to the heir. And if the government from motives of public policy, or any other considerations, should think proper, under such circumstances, to make a grant of money to the heirs of the claimant, they receive it as a gift or pure donation. A donation made, it is true, in reference to some meritorious act of their ancestor, but which did not constitute a matter of right against the government."

Manifestly the claims involved in these cases do not come within the rule laid down in *Comegys* v. *Vasse* and *Heard* v. *Williams*, and, without intimating any opinion on their merits, the legislation seems to us plainly to place them within that applied in *Emerson's Heirs* v. *Hall*, though the circumstances are not the same.

The first clause of the proviso relates to cases where the original sufferers were adjudicated bankrupts, and specifically requires the awards to be "made on behalf of the next of kin instead of the assignees in bankruptcy." As we have seen, the Court of Claims had informed Congress that their view was that the action of the United States came within the constitutional provision as to the taking of private property for public use, and hence that Congress was bound to pay the claimants what was due them by reason of such taking, and further that they had accordingly made awards in favor of assignees in bankruptcy. But Congress declined to accept the views of the Court of Claims and to treat these claims as property of the original claimants, transferable and transmissible like other property of the nature of choses in action, and expressly. provided that the awards should be made to the next of kin instead of the assignees in bankruptcy.

In *Henry* v. *United States*, 27 C. Cl. 142, 145, decided after the act of March 3, 1891, was passed, the court makes a particular explanation as to this part of the proviso, saying :

"Among the claimants were several assignees, or representatives of assignees, of original sufferers who had been declared bankrupts, and the court reported in those cases that the as-

:signees, or representatives of the assignees, were entitled to receive from the United States the sum found to be the amount of the losses.

"In Congress an appropriation bill was drawn and printed containing appropriations for all the persons named in the reports of the Court of Claims. From that bill were stricken out all appropriations to assignees in bankruptcy so far as their representative character appeared in the language of the act. This is a decided indication that Congress did not intend to pay assignees in bankruptcy."

It was held that the language used in the first clause was intended to apply to future reports, Congress having disapproved the recommendations in favor of assignees made up to the date of the act. That disapproval practically illustrates the difference of view between Congress and the Court of Claims as to the basis on which the allowances were made.

The second clause provides, " that the awards in the cases of individual claimants shall not be paid until the Court of Claims shall certify to the Secretary of the Treasury that the personal representatives in whose behalf the award is made, represent the next of kin." Reading the first clause in the light of the second, the. meaning is that in case of bankruptcy the award. should be made as it would be, if the original sufferer had not been declared bankrupt, namely, " on behalf of the next of kin." And the occasion of the introduction of the first clause obviously was to prevent repetition of the action which had proved fatal to some of the recommendations.

The second clause is not limited to the cases named in the first clause, although in a certain sense it may be said to include them by way of anticipation, for it applies to all cases of individual claimants, as contradistinguished from corporations, and requires the certificate as a prerequisite to their payment, " that the personal representatives on whose behalf the award is made represent the next of kin."

It appears to us that Congress intended that the next of kin should be the beneficiaries in every case; that the limitation is express; and that creditors, legatees and assignees, all strangers to the blood, are excluded.

No reason is suggested for cutting off creditors where the original sufferer became bankrupt, and not cutting them off, where, not having gone into bankruptcy, the estate was insolvent; nor for the payment of awards to the original sufferer's next of kin if he were bankrupt, and not, if he were not. The general rule is that so long as the debts of a decedent remain unpaid the assets which come into his estate are to be applied in payment, and these moneys, if they could be treated as assets at all, (being paid over, not as in liquidation of preëxisting claims thereby acknowledged, but as concessions made on equitable considerations,) would partake of the nature of subsequently discovered assets, and be liable to be subjected to the payment of debts. But this cannot be so, for the awards are explicitly required to be made on behalf of the next of kin, and to be paid only to personal representatives representing the next of kin.

The certificate must be that the personal representative does in fact represent the next of kin, and so receives the payment on their behalf. This certificate is as much required with respect of an administrator with the will annexed as of an administrator in case of intestacy, and yet administrators with the will annexed hold adversely to the next of kin and do not represent them, if the fund is to be distributed according to the will as assets of the estate. Congress well understood this in requiring that next of kin must be represented notwithstanding many of the items of appropriation were in favor of administrators with the will annexed. In *Buchanan* v. *United States, supra,* the Court of Claims called the attention of Congress to the fact that, notwithstanding its own recommendations, it remained for Congress to determine, " first, the measure of the indemnity for which the United States should be held responsible; second, the persons who are equitably entitled to receive it." And Congress thereupon determined the next of kin to be the persons " equitably entitled to receive; " and while in the interpretation of wills "next of kin" is sometimes construed to mean other persons than those of the blood or under the statute of distributions, as for instance, legatees,

we see no reason to construe this statute as having that operation.

In *Milligan's case*, as appears from the opinion of the Court of Claims in *Durkee* v. *United States*, 28 C. Cl. 326, a certificate was refused because there were no blood relations of the original sufferer, and the administrator had really prosecuted the claim for the benefit of the widow's next of kin. Congress then passed the act of August 23, 1894, 28 Stat. 487, sec. 5, providing that "in the event the court shall find there were no next of kin, and that there was a widow, then that said sum be paid to the executor, personal representative or next of kin of such widow." This made a new disposition of the fund upon the theory that it did not belong to the general assets or the original sufferer's estate, and that where there were no next of kin, in the ordinary signification of the word, new legislation was required.

The events which had given rise to these claims had occurred nearly a century before, and there was nothing unreasonable in the determination of Congress that only the immediate family of the original sufferers should participate in these awards. These sufferers had been in their graves for sixty years. The reasons which might have influenced them in making particular testamentary dispositions had disappeared with time. The claims of creditors had long been outlawed. Equities had become too complicated to be traced. It was enough if the fund passed to persons of the blood of the original sufferers, or who might be entitled under the statutes of distributions, which had been provided in each State, by general legislation, as to the devolution of property in case of intestacy. After all, it would then go as the original claimants might have desired if no special reasons operated to the contrary, and as, in frequent instances, it would have finally gone when those reasons, if once existing, had ceased to operate.

And this conclusion is in harmony with the legislation considered in *Emerson's Heirs* v. *Hall, supra;* with section 1981 of the Revised Statutes in reference to recovery of damages by the legal representatives of persons killed by wrongful act in

violation of the civil rights act of 1871 ; the act of Congress of February 17, 1885, c. 126, 23 Stat. 307, providing for actions in the District of Columbia for the death of persons caused by wrongful acts of others; and generally with the statutes of the States giving a right of action for injuries resulting in death. Tiffany on death by wrongful act, App. 281, 344.

The third clause provided that the awards should not be paid until "the courts which granted the administrations, respectively, shall have certified that the legal representatives have given adequate security for the legal disbursement of the awards." It is argued that this implies that the money received by them was to be administered as assets belonging to the estate, but we do not think so. It often happens that administrators receive money which is not to be administered as part of the general assets, but is to be distributed in a particular way. Whether upon his general bond an administrator could be held for the performance of such special duty might depend upon the local statutes of each State, and Congress was not obliged to consider whether the ordinary bond would cover the case, or whether a new bond would be required, or whether additional state legislation would be necessary. At all events, the express language of the act cannot be overcome by the difficulty suggested, if it be such, and the intention of Congress in favor of the next of kin thereby rendered liable to be defeated.

From these considerations and by necessary construction of the language employed, it results that "next of kin" as used in the proviso means next of kin living at the date of the act. The Court of Claims must certify that the personal representatives "represent the next of kin," and that court has properly held that before there can be a certificate of that fact it must appear that some next of kin are now in existence. *Hooper* v. *United States*, 28 C. Cl. 480 ; *Durkee* v. *United States*, 28 C. Cl. 326. This construction is sustained by the legislation of Congress referred to in *Durkee* v. *United States*, where two instances are mentioned of special acts giving the fund to other than blood relations of the original sufferers. The exceptions prove the rule.

And we are of opinion that Congress, in order to reach the next of kin of the original sufferers, capable of taking at the time of distribution, on principles universally accepted as most just and equitable, intended next of kin according to the statutes of distribution of the respective States of the domicil of the original sufferers. In all the States real estate descends equally to the children of the decedent, and to the issue of deceased children taking *per stirpes*, and in most of them personal estate is distributed in the same manner, the variations being immaterial here. 1 Stimson's American Statute Law, §§ 3101, 3102, 3103, pp. 390, 391. The object of Congress was that the blood of the original sufferers should take at the date of the passage of the act, and the statutes of distribution are uniformly framed to secure that result as nearly as possible, the right of representation being recognized. To hold that the meaning is nearest of blood on March 3, 1891, might cut off many of the blood, who would otherwise take by descent from those nearest at the ancestors' deaths, and an intention to do this contrary to the general rule cannot be imputed. So that in ascertaining who are to take, the fund, though not part of the estates of the original sufferers, may be treated as if it were, for the purposes of identification merely.

In the construction of wills and settlements, after considerable conflict of opinion, the established rule of interpretation in England is that the phrase "next of kin," when found in ulterior limitations, must be understood to mean nearest of kin without regard to the statutes of distribution. 2 Jarman on Wills, (5th ed.) *108, *109. This rule was followed in *Swasey* v. *Jaques*, 144 Mass. 135, where Field, J., speaking for the court, said: "It is certainly difficult to distinguish between the expressions 'next of kin,' 'nearest of kin,' 'nearest kindred,' and 'nearest blood relations,' and primarily the words indicate the nearest degree of consanguinity, and they are perhaps more frequently used in this sense than in any other. What little recent authority there is beyond that of the English courts supports the English view; and on the whole we are inclined to adopt it. *Redmond* v. *Burroughs*,

63 N. C. 242; *Davenport* v. *Hassel,* Busb. Eq. 29; *Wright* v. *Methodist Episcopal Church,* Hoff. Chan. 202, 213." But the rule does not appear to have been approved in New York and New Hampshire. *Tillman* v. *Davis,* 95 N. Y. 17, 24; *Pinkham* v. *Blair,* 57 N. H. 226.

Moreover, it is settled in Massachusetts as well as elsewhere that " where a clause is fairly susceptible of two constructions also, that certainly is to be preferred which inclines to the inheritance of the children of a deceased child," *Bowker* v. *Bowker,* 148 Mass. 198, 203; *Jackson* v. *Jackson,* 153 Mass. 374; and in Connecticut that, " when the terms of a will leave the intention of the testator in doubt the courts generally incline to adopt that construction which conforms more nearly to the statute of distributions," *Geery* v. *Skelding,* 62 Conn. 499, 501; *Conklin* v. *Davis,* 63 Conn. 377. As put by Rapallo, J., in *Low* v. *Harmony,* 72 N. Y. 408, 414: " When the language of a limitation is capable of two constructions, one of which would operate to disinherit a lineal descendant of the testator, while the other will not produce that effect, the latter should be preferred. An intention to disinherit an heir, even a lineal descendant, when expressed in plain and unambiguous language, must be carried out; but it will not be imputed to a testator by implication, when he uses language capable of construction which will not so operate."

We are not, however, dealing with wills or settlements, but with the words " next of kin," as used in a statute, passed, in acknowledgment of losses incurred by the ancestors, under circumstances rendering conjecture futile as to what their action, if exercising a volition in the matter, might be, and where the act clearly indicates the judgment of Congress that the next of kin for the purposes of succession generally should be the beneficiaries as most in accord with the theory of the appropriations.

The Supreme Court of the District of Columbia, *Gardner* y. *Clarke,* 20 Dist. Col. 261; the Supreme Court of Pennsylvania, *Clements' Estate,* 160 Penn. St. 391, and the Circuit Court of Baltimore County, Maryland, *Leffingwell's Estate,* 49

Phil. Leg. Int. 147, have expressed similar views to the fore-
going.

*The judgments are, severally, reversed, and the causes re-
manded for further proceedings not inconsistent with
this opinion.*

Mr. Justice Gray did not sit in these cases or take any part
in their decision.