CHAS. T. MAIN INTERNATIONAL,
INC., Plaintiff,

v.

UNITED STATES: Ronald Reagan, as he
is President of the United States; and
Donald Regan, as he is Secretary of the
Treasury of the United States, Defendants.

Civ. A. No. 81-315-C.

United States District Court,
D. Massachusetts.

March 17, 1981.

Samuel Hoar, Carol Goodman, Kenneth
Simons, Goodwin, Procter & Hoar, Boston,
Mass., for plaintiff.

Asst. U. S. Atty. Donald Anderson, and
William K. Black, Dept. of Justice, Washington, D. C., for defendants.

OPINION

CAFFREY, Chief Judge.

This is a civil action against the United
States, President Reagan and Secretary of
the Treasury Regan in which plaintiff,
Chas. T. Main International, a corporation
organized under the laws of the Commonwealth of Massachusetts, seeks declaratory
and injunctive relief as well as a writ of
mandamus. The action was triggered by
the execution of a series of Executive Orders by former President Carter and President Reagan. Those Executive Orders
were entered by either former President
Carter or President Reagan as part of an
agreement between the United States and
Iran which led to the release by Iran of 52
American hostages. President Reagan's
Executive Orders were entered in implementation of the agreement made with the
Iranians by President Carter.

Jurisdiction is claimed on the basis of 28
U.S.C. §§ 1331(a), 1362, 1651, 2201 et seq.
for causes of action alleged to have arisen
under Articles I and III of the Constitution
of the United States and Amendments V
and VII thereto as well as under 5 U.S.C.
§§ 702, 703; 22 U.S.C. § 1732; 28 U.S.C.
§§ 1331, 1601; and finally under 50 U.S.C.
§ 1701. A stipulation of fact filed herein by
the parties on March 11, 1981 with attachments thereto is incorporated herein by reference, is appended hereto, and for that
reason this opinion will not recite the underlying facts contained in the stipulation,
all of which are taken as true for purposes
of this ruling. The matter came before the
Court on defendants' motion to dismiss the
complaint for failure to state a claim upon

which relief may be granted and on plaintiff's cross motion for partial summary judgment.

In a related civil case, *Chas. T. Main International, Inc. v. Khuzestan Water and Power Authority, et al.*, C.A. 79–2304–C, filed November 20, 1979, this Court entered an order approving attachments of Iranian assets on trustee process and this Court also entered a temporary restraining order in that case preventing the Iranian defendants from "selling, assigning . . . or in any way disposing of any of their assets located in the United States." The Iranian defendants took an appeal from the order allowing the attachments and from the preliminary injunction. However, the Court of Appeals for the First Circuit remanded the appeal to this Court on February 23, 1981 with directions to, in effect, start all over again in view of the changed situation consisting of the release of the hostages, the agreement between the United States and Iran, and the Executive Orders entered by Presidents Carter and Reagan. The Court of Appeals did not vacate the Court's order of November 20, 1979 and the attachments and injunction are still in effect as of this date.

Similar attachments were obtained by plaintiff in the Southern District of New York. An appeal has been taken to the Court of Appeals for the Second Circuit and as of this date the ex parte attachments authorized in the Southern District of New York have not been vacated by the Court of Appeals for the Second Circuit. If the attachments and the injunction which this Court and the District Court for the Southern District of New York entered are legally valid, Chas. T. Main has encumbered funds in various American banks in amounts totalling in excess of the full amount of Chas. T. Main's claim against all Iranian defendants. It should be noted that Chas. T. Main's case C.A. 79–2304–C is a civil action to collect for work allegedly done by Main under a contract for its professional services entered into between Main and certain Iranian entities.

As part of the agreement negotiated by President Carter to obtain release of the hostages, the United States and Iran agreed to settle the claims of American nationals against Iranian entities through the medium of binding arbitration. The agreement provided for the establishment of an international arbitration tribunal and provided for the setting up of a $1 billion fund by the Iranian authorities, to be available for the satisfaction of awards against Iranian defendants made by the arbitration tribunal.

By his Executive Order President Carter nullified all non-Iranian interests in Iranian properties located in this country, terminated all attachments against those assets, and directed the transfer of those assets. President Reagan by Executive Order adopted and, in effect, ratified the agreement made by President Carter with the government of Iran and the Executive Orders entered by President Carter as part of that agreement. On February 24, 1981 President Reagan signed Executive Order No. 12294 in which, acting on the basis of his authority under the Constitution and statutes of the United States, and more particularly, acting under the provisions of the International Emergency Economic Powers Act, 50 U.S.C. § 1702, he ordered that:

> All claims which may be presented to the Iran-United States Claims Tribunal under the terms of Article II of the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran, and all claims for equitable or other judicial relief in connection with such claims, are hereby suspended, except as they may be presented to the Tribunal. During the period of this suspension, all such claims shall have no legal effect in any action now pending in any court of the United States . . . .

President Reagan also expressly ratified Executive Orders 12276 through 12285, all of which were dated January 19, 1981 and signed by former President Carter.

In the instant case and, more specifically, on the motion for partial summary judgment, plaintiff seeks a ruling that the Exec-

utive Orders purporting to suspend its lawsuits against Iranian defendants and to nullify the attachments previously authorized and the preliminary injunction previously entered, are unlawful because the Executive Orders violated or are inconsistent with the Foreign Sovereign Immunity Act, 28 U.S.C. §§ 1330, 1602 et seq., violated the International Emergency Economic Powers Act, exceeded the limitations of the President's power under that Act, exceeded the powers granted to the President under Article II of the United States Constitution, and violated claimed rights of Chas. T. Main under the First and Fifth Amendments.

The government rejoinder in substance is that the actions of both Presidents are authorized both by the provisions of Article II of the Constitution and by the several statutes cited above.

■ The basic and underlying issue raised by this case is the extent of Presidential power in secret negotiations with a foreign government during a crisis situation; i. e. may the President of the United States in the course of negotiating a hostage release agreement with a foreign government require by Executive Order that certain causes of action pending in United States District Courts, at and prior to the date of the Order, be removed from those United States District Courts and presented for adjudication before an international arbitration tribunal established by the negotiated agreement. Resolution of this question in the affirmative makes it unnecessary to resolve the other issues raised by the pleadings.

It takes no great amount of scholarship to realize that with several hundred cases pending against the government of Iran and other Iranian governmental, quasi-governmental and possibly private agencies, the final words resolving this question will come from the United States Supreme Court. An expedited decision on the issue of Presidential authority is of considerable importance on these unusual facts, both to the United States Government in its conduct of foreign relations, and to the plaintiff Chas. T. Main International, particular-

ly in light of the need for a definitive ruling by July 19, 1981, the date by which all Iranian funds are to be transferred pursuant to the Executive Orders. If a clear ruling is not forthcoming, the United States may be viewed as breaching its agreement, and Chas. T. Main International may be prejudiced if its claims to the tribunal are delayed. The need for such a ruling outweighs any purpose that might be served if this judge, who is but one of the more than twenty District Judges before whom these several hundred cases are pending, attempted to write the definitive constitutional exposition of the extent of the powers of an American President in conducting negotiations with a foreign government of the complexity involved herein.

Suffice it to say that the writer of this opinion is persuaded by the provisions of Article II of the Constitution of the United States, by the provisions of the International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq., the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602 et seq. and by a number of cases decided by the Supreme Court of the United States that the President does have such power and that Presidents Carter and Reagan have acted in compliance with all applicable laws of the United States in their actions in connection with the resolution of the problems between the government of Iran and the government of the United States.

In so ruling I have in mind not so much the strict rulings of law in the following quoted decisions from the Supreme Court of the United States, all of which were decided long before the abominable Ayatollah reared his ugly head, but rather the principles of law endorsed therein.

These cases when read carefully, allowing due regard for the different factual situations which gave rise to them, clearly, in the judgment of this writer, show an attitude and inclination on the part of the Supreme Court of the United States to broadly construe the powers of an American President deriving from the Constitution or from an Act of Congress in the field of foreign and international relations. I

have in mind as illustrative of the Supreme Court's approach to the scope of presidential power the following statements:

The President ... possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs. For present purposes, the order draws vitality from either or both sources.... [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry. *C. & S. Air Lines v. Waterman Corp.*, 333 U.S. 103, 109, 111, 68 S.Ct. 431, 435, 436, 92 L.Ed. 568 (1948).

The recognition, establishment of diplomatic relations, the assignment, and agreements with respect thereto, were all parts of one transaction, resulting in an international compact between the two governments. That the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President may not be doubted. Governmental power over internal affairs is distributed between the national government and the several states. Governmental power over external affairs is not distributed, but is vested exclusively in the national government. And in respect of what was done here, the Executive had authority to speak as the sole organ of that government. *United States v. Belmont*, 301 U.S. 324, 330, 57 S.Ct. 758, 760, 81 L.Ed. 1134.

[Executive] authority is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition.... Power to remove such obstacles to full recognition as settlement of claims of our nationals certainly is a modest implied power of the President who is the "sole organ of the federal government in the field of international relations." ... *United States v. Curtiss-Wright Corp., supra*, [229 U.S. at], p. 320 [57 S.Ct. at p. 221, 81 L.Ed. 225]. Effectiveness in handling the delicate problems of foreign relations requires no less .... *United States v. Pink*, 315 U.S. 203, 229, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942).

Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in his great argument of March 7, 1800, in the House of Representatives, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." Annals, 6th Cong., col. 613....

It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance of

our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, Congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.... *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 319, 320–21, 57 S.Ct. 216, 220, 221, 81 L.Ed. 225 (1936).

Moreover, this is not a case where there is no statutory support for the presidential assertion of power. Compare, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952). The two recent statutes enacted by Congress, the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.* and the Foreign Sovereign Immunity Act of 1976, 28 U.S.C. §§ 1330, 1602 *et seq.*, are consistent with the existence of broad presidential power in extraordinary foreign affairs situations. Congress never intended, in passing the Foreign Sovereign Immunity Act, to cripple the negotiating power of American Presidents. The Executive Orders are squarely within the authority vested in the President by IEEPA. IEEPA explicitly authorizes the President (1) to "compel . . . any . . . transfer . . . [of] any property in which any foreign country or a national thereof has any interest," (2) to "nullify, void, prevent or prohibit, any acquisition [or] holding [of] . . . any property in which any foreign country or a national thereof has any interest," and (3) to "void . . . [the] exercising [of] any right . . . with respect to . . . any property in which any foreign country or a national thereof has any interest . . ." 50 U.S.C. § 1701(a)(1)(B).

■ Plaintiff places great weight in support of its motion for partial summary judgment and in opposition to the defendants' motion to dismiss on its contention that two attorneys employed by the Treasury orally stated to representatives of the plaintiff that the licenses granted to plaintiff by the government would not be revocable. This oral representation, which is assumed to be factual for purposes of this motion, does not raise a genuine issue of material fact sufficient to frustrate the allowance of the government's motion or to warrant the allowance of plaintiff's motion. I rule as a matter of law that inferior Treasury officials had no authority to convert what were issued as expressly revocable licenses into irrevocable licenses, and I further rule that the action of the Treasury lawyers could not bind either the United States, President Carter or President Reagan. See, *Federal Crop Insurance v. Merrill*, 332 U.S. 380, 383–85, 68 S.Ct. 1, 2–3, 92 L.Ed. 10 (1947).

On the record of this case, I rule that the actions of President Carter and Reagan have a legal basis in the provisions of Article II of the Constitution of the United States as well as in the powers granted to them by the provisions of the International Emergency Economic Powers Act. Where "the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer, supra*, 343 U.S. at 635, 96 S.Ct. at 870 (Jackson, J., concurring). Consequently, the Executive Orders entered by both Presidents in resolving the Iranian crisis are legal and valid. Accordingly, an order will enter allowing defendants' motion to dismiss and denying plaintiff's motion for partial summary judgment.