SECURITY PACIFIC NATIONAL
BANK, Plaintiff,

v.

The GOVERNMENT AND STATE OF
IRAN et al., Defendants.

HAWAIIAN AGRONOMICS COMPANY,
(INTERNATIONAL), a Liberian
corporation, Plaintiff,

v.

GOVERNMENT OF IRAN, Imperial
Government of Iran et al.,
Defendants.

HOOD CORPORATION, Plaintiff,

v.

ISLAMIC REPUBLIC OF IRAN, Central
Bank of Iran, and Iran-Arab
Bank, Defendants.

HOFFMAN EXPORT CORPORATION,
Plaintiff,

v.

The GOVERNMENT OF IRAN,
Defendant.

Nos. CV 79–4661–RJK (Gx), CV 79–4875–
RJK (Px), CV 80–0175–RJK (Kx) and
CV 80–0524–RJK (Kx).

United States District Court,
C. D. California.

April 30, 1981.

James W. Colbert, III, Alexander H. Good, O'Melveny & Myers, John F. Kimberling, Valerie L. Baker, Lillick, McHose & Charles, Ellen B. Friedman, Michael C. Kelley, Kadison, Pfaelzer, Woodard, Quinn & Rossi, Loyd P. Derby, Robert M. Mitchell, James J. Moak, Adams, Duque & Hazeltine, Los Angeles, Cal., for plaintiffs.

Chris G. Gasparich, William W. Schofield, Jr., Crosby, Heafey, Roach & May, Oakland, Cal., Eric M. Lieberman, Gordon J. Johnson, Ellen J. Winner, Rabinowitz, Boudin, Stan-

dard, Krinsky & Lieberman, New York City, Peter H. Strong, Anthony J. Van Patten, Fenwick, Stone, Davis & West, Los Angeles, Cal., Greg A. Danilow, Michael S. Oberman, Daniel P. Levitt, Kramer, Levin, Nessen, Kamin & Soll, Gary A. Woodfield, Gadsby & Hannah, Marcia B. Paul, Greenbaum, Wolff & Ernst, New York City, Marvin Sears, Michael D. Koomer, Martin S. Zohn, Pacht, Ross, Warne, Bernhard & Sears, Inc., Los Angeles, Cal., for defendants.

Andrea Sheridan Ordin, U. S. Atty., Frederick M. Brosio Jr., Dzintra I. Janavs, Asst. U. S. Attys., Los Angeles, Cal., Thomas S. Martin, Acting Asst. Atty. Gen., David J. Anderson, Mark C. Rutzick, Marta Berkley, Dept. of Justice, Washington, D. C., Mark B. Feldman, Acting Legal Advisor, Timothy E. Ramish, Dept. of State, Washington, D. C., on brief, for United States.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

### BACKGROUND

Each of these cases is related to the political turmoil in Iran, the seizure of United States diplomats and other nationals as hostages in the United States Embassy in Teheran on November 4, 1979, the freezing of Iranian assets by Presidential order, and the subsequent formal break in diplomatic relations and economic ties between the United States and Iran. Plaintiffs are private corporations that had done business in Iran during the reign of the late Shah of Iran. After the overthrow of that government, the present government refused or was unable to perform its duties to these plaintiffs. Plaintiffs filed these suits and obtained writs of attachment on Iranian assets held in this country.[1]

Shortly after the taking of the hostages, then-President Carter issued Executive Order 12170, 44 Fed.Reg. 65729 (November 14, 1979). This Executive Order declared that the Iranian hostage situation posed a national emergency. It therefore ordered: "blocked all property and interests in property of the Government of Iran ... which are or become subject to the jurisdiction of the United States or which are or come within the possession or control of persons subject to the jurisdiction of the United States." The President claimed authority for the Order pursuant to the International Emergency Economic Powers Act [IEEPA], 50 U.S.C. § 1701 et seq., the National Emergencies Act, 50 U.S.C. § 1601 et seq., and 3 U.S.C. § 301. Each of these suits was filed after the issuance of this Executive Order.

Pursuant to the Order, the Iranian Assets Control Regulations, 31 C.F.R. § 535 (1980) were issued. The Regulations prohibited transfer, payment, export, withdrawal or other dealings with regard to property of Iran that was subject to the jurisdiction of the United States. The Regulations further provided that "Unless licensed or authorized pursuant to [these Regulations], any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since the effective date there existed an interest of Iran." 31 C.F.R. § 535.203(e) (1980). The Regulations specifically authorized judicial proceedings against the blocked assets.

(a) ... judicial proceedings are authorized with respect to property in which on or since the effective date there has existed an interest of Iran or an Iranian entity.

(b) This section does not authorize or license:

(1) The entry of any judgment ...

(2) Any payment or delivery out of a blocked account based upon a judicial proceeding ...

31 C.F.R. § 535.504 (1980).

The Regulations also authorized the issuance of pre-judgment attachments against the blocked funds. However, the transfer or payment of such property to the court or to the Marshal was prohibited. 31

---

1. There are presently over 400 such suits pending in courts throughout the country. The claims in these suits total several billion dollars.

C.F.R. § 535.418 (1980). Finally, the Regulations provided that any licenses, including attachments, could be "amended, modified, or revoked at any time." 31 C.F.R. § 535.-805 (1980).

Various diplomatic and military efforts were made to resolve the hostage problem during 1980. At the same time, prosecution of these suits was advanced. Alternative service on defendants was authorized. On several occasions, the United States sought an Order of this Court staying these actions. No such stay was granted.

Finally, on January 19, 1981, the United States, by Warren Christopher, Deputy Secretary of State,[2] agreed to a settlement of the hostage situation. The terms of the settlement were contained in two documents: the Declaration of the Government of the Democratic and Popular Republic of Algeria (January 19, 1981) [the General Declaration] and the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (January 19, 1981) [the Settlement Declaration].

Among the terms of the General Declaration, the United States agreed that:

> It is the purpose of both parties . . . to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration . . . . [T]he United States agrees to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration.

The General Declaration further provided that all funds transferred pursuant to the Declaration should be held in escrow by the Central Bank of a designated third country (the Bank of England) until the American hostages in Iran had been released. The United States was obligated to transfer all of the gold bullion and other assets, owned by Iran and in the custody of the Federal Reserve Bank of New York, to this escrow account immediately. The General Declaration further provided for the immediate transfer of Iranian assets held by foreign branches of United States banks to the escrow account.

With regard to Iranian assets in the possession of domestic branches of United States banks, the General Declaration requires that a separate security account be established at the Central Bank thirty days after the date of the Declaration. The United States is obligated to take action, within six months after the date of the agreements, to transfer all such funds and other assets to the bank. The Bank is to transfer half of these assets directly to Iran. The other half are to be deposited in the security account until the balance in that account reaches one billion ($1,000,-000.00) dollars. All further funds transferred to the Bank are to be transferred without deduction to Iran. The security fund is to be used to pay claims against Iran in accordance with the Settlement Declaration. Iran is obligated to maintain a minimum balance of five hundred million ($500,-000,000.00) dollars in the security account. The account will be closed only after the satisfaction of all judgments made pursuant to the Settlement Declaration.

The Settlement Declaration provides:

> Iran and the United States will promote the settlement of the claims . . . by the parties directly concerned. Any such claims not settled within six months from the date of entry into force of this agreement shall be submitted to binding third-party arbitration in accordance with the terms of this agreement. The aforementioned six months' period may be extended once by three months at the request of either party.

---

**2.** The Declarations were not submitted to the Senate for ratification as a treaty and therefore must come within the President's powers to make executive agreements. *See infra.*

The Settlement Declaration establishes "[a]n International Arbitral Tribunal (the Iran-United States Claims Tribunal) ..." The Tribunal is given jurisdiction over "claims of nationals of the United States against Iran ... outstanding on the date of this agreement, whether or not filed with any court ..." The Settlement Declaration sets forth the procedures for the establishment of the Tribunal, as well as the procedures for its operation.

The Settlement Declaration provides that all decisions of the Tribunal shall be binding on the parties. It provides further that the decisions may be enforced in the courts of any nation. Finally, the Tribunal is given the power to interpret the Settlement Declaration.

On the same date, January 19, 1981, President Carter issued a series of Executive Orders to enforce the Declarations.[3] Each of the Orders provides that it is made "in order to implement agreements with the Government of Iran ...[4]

These Executive Orders provide for the revocation or nullification of "any right, power, or privilege," including any court ordered attachment, relating to the property. Each further orders that no additional attachments may be established against such property.

Upon the inauguration of President Reagan, on January 20, 1981, the United States re-examined the validity of the General Declaration, the Settlement Declaration and the Executive Orders designed to implement them. Thereafter, President Reagan issued Executive Order 12294, 46 Fed.Reg. 14111 (February 24, 1981).[5] This Executive Order provides:

Section 1. All claims which may be presented to the Iran-United States Claims Tribunal ... are hereby suspended ... During the period of this suspension, all such claims shall have no legal effect in any action now pending in any court of the United States ...

Section 2. Nothing in this Order shall require dismissal of any action for want of prosecution.

Section 3. Suspension under this Order of a claim ... shall terminate upon a determination by the Tribunal that it does not have jurisdiction over such claim ...

Section 4. A determination by the ... Tribunal on the merits ... shall operate as a final resolution and discharge of the claim for all purposes.

. . . .

Section 8. Executive Order Nos. 12276 through 12285 of January 19, 1981, are ratified.

Secretary of State Haig, in a written declaration of the same date, stated that the initial transfer of gold bullion and other assets held by the Federal Reserve Bank of New York, as well as the transfer of funds

---

**3.** These Executive Orders rely upon the same authority as did Executive Order 12170. In addition, these Orders cite the authority of 22 U.S.C. § 1732.

**4.** Executive Order 12276, 46 Fed.Reg. 7913 (January 19, 1981) provides for the establishment of the escrow account at the Bank of England. Executive Order 12277, 46 Fed.Reg. 7915 (January 19, 1981) requires the transfer of Iranian gold bullion and other assets, held by the Federal Reserve Bank of New York, to the escrow account. Executive Order 12278, 46 Fed.Reg. 7918 (January 19, 1981) requires the transfer of all Iranian assets held by foreign branches of United States banks to the escrow account. It further cancels all bankers' setoffs against such funds. Executive Order 12279, 46 Fed.Reg. 7919 (January 19, 1981) requires the transfer of Iranian funds held by domestic branches of United States banks to the Federal Reserve Bank of New York. Executive Order 12280, 46 Fed.Reg. 7921 (January 19, 1981) requires the transfer of all Iranian funds, held by anyone other than a bank, to the Federal Reserve Bank of New York. Executive Order 12281, 46 Fed.Reg. 7923 (January 19, 1981) requires the transfer of all Iranian property, other than funds or securities, directly to the Government of Iran. Executive Orders 12282 through 12285, 46 Fed.Reg. 7925–32 (January 19, 1981) relate to the implementation of other sections of the two Declarations. These Executive Orders were later implemented by amendments to the Iranian Assets Control Regulations, 31 C.F.R. § 535, *et. seq. See* 46 Fed.Reg. 14330–37 (February 26, 1981).

**5.** This Order relies on the same authority cited in Executive Orders 12277–12285. *See* note 3, *supra.*

held by foreign branches of United States banks, had resulted in the transfer of "nearly $8 billion of Iranian assets." Of these, "[a]pproximately $5.1 billion" in assets were used to pay syndicated bank loans held by United States banks. The Declaration of Secretary Haig further stated:

4. The Administration has determined that the conclusion of the agreements was a legal exercise of Presidential authority and that the United States should implement these agreements because they are in the interest of the United States. They represent the surest way of resolving many of the financial problems between the United States and Iran consistent with the interests of U.S. claimants and the broader interests of the United States in the Persian Gulf area, a region of strategic importance to the United States.

5. If the United States should be prevented from freeing the Iranian assets from judicial restraints . . . the whole structure of the agreements may begin to crumble . . .

6. Judicial action preventing the United States from carrying out its obligations under these agreements would seriously damage the President's capacity to speak and act for the United States in the conduct of its foreign relations, and would be perceived abroad as a serious weakness in the ability of the United States Government to carry out its international commitments. . . .

On February 27, 1981, the United States filed a Statement of Interest in each of these cases. The Statement of Interest sought the suspension of proceedings and the vacating of the attachments in each of the cases. This Court thereupon Ordered plaintiffs in each action to show cause in writing why the Declarations should not be given effect, the actions dismissed without prejudice and the outstanding attachments vacated. Defendants were given an opportunity to reply to plaintiffs' written submissions.

The issue thus squarely presented for this Court's determination is whether the President had sufficient authority under the Constitution and the laws of the United States, on the facts of the Iranian hostage situation, to adhere to the General Declaration and the Settlement Declaration and to issue the Executive Orders to implement those Declarations.

Since the entry into force of the Declarations, three separate District Courts have considered the validity of the Presidents' actions. The first, *Electronic Data Systems Corp. Iran v. The Social Security System of the Government of Iran*, 508 F.Supp. 1350 (N.D.Tex.1981) [*EDS*], was decided prior to the filing of the Statement of Interest by the United States. Plaintiff had filed a motion for a preliminary injunction to restrain the revocation of the attachments ordered in that action. In granting the preliminary injunction, the Court held that Executive Order 12279 interfered with the valid exercise of the jurisdiction of the federal courts, interfered with an express grant of jurisdiction from Congress pursuant to the Foreign Sovereign Immunities Act and improperly vested the attached assets in the United States. The Court concluded that on each of these three bases, the Executive Order exceeded the authority provided in the IEEPA. The Court also concluded that the Executive Order violated the constitutional doctrine of separation of powers.

The *EDS* decision is relied upon heavily by plaintiffs in each of the cases before this Court. Yet, the parties lose sight of several important facets of that decision. First, the decision was on a motion for a preliminary injunction. Thus, in addition to the conclusions of law recited above, the Court considered the relative hardship to each of the parties from the entry of such an injunction. Second, the Court itself considered that its legal conclusions were preliminary. *Id.* at 1364. The United States had not responded fully to the legal arguments of plaintiff since the Reagan Administration had not completed its review of the agreement. Finally, the action had been commenced prior to the taking of the American hostages in Iran. It also had

proceeded to a final judgment by May 9, 1980, well before the agreement between the United States and Iran in January, 1981. The *EDS* decision is distinguishable on each of these grounds from the cases now before this Court.

The second court to consider the validity of the agreement was *Chas. T. Main Int'l Inc. v. United States*, 509 F.Supp. 1162 (D.Mass.1981). Plaintiff brought its action after the entry into force of the agreement between the United States and Iran. Plaintiff sought declaratory and injunctive relief as well as a writ of mandamus preventing enforcement of the Executive Orders issued by Presidents Carter and Reagan. Defendant United States filed a motion to dismiss the action. The Court found that the "actions of Presidents Reagan and Carter have a legal basis in the provisions of Article II of the Constitution of the United States as well as in . . . the International Emergency Economic Powers Act." *Id.* at 1164. Accordingly, the Court dismissed the action pursuant to F.R.Civ.P. 12(b)(6).

Most recently, the Court in *Unidyne Corp. v. Gov't of Iran*, 512 F.Supp. 705 (E.D.Va.1981) considered the validity of the agreement. The suit in *Unidyne* was filed after the taking of the hostages in Iran. Attachments of Iranian assets were also ordered on December 29, 1980. *Unidyne* was thus factually similar to these actions. The Court held that "The release of the attachments is a necessary concomitant of the President's foreign relations power under the Constitution and is further authorized by Congress under IEEPA." *Id.* at 710. The Court accordingly ordered that the attachments be vacated but refused to stay the proceedings.

## SCOPE OF REVIEW

Perhaps the best framework for this Court's analysis of the Presidents' actions is that provided in the celebrated concurrence of Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). In considering President Truman's power to seize the na-

tion's steel mills to prevent a threatened strike during the Korean War, Justice Jackson wrote:

The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending on their disjunction or conjunction with those of Congress. We may well begin by a somewhat over-simplified grouping of practical situations in which a President may doubt, or others may challenge, his powers, and by distinguishing roughly the legal consequences of this factor of relativity.

1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth), to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power . . . .

2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary

imponderables rather than on abstract theories of law.

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Id.,* 343 U.S. at 635–38, 72 S.Ct. at 870–871 (footnotes omitted).

This Court thus is faced with examining both the President's independent power to act pursuant to the Constitution in these matters, and legislative enactments that may have expanded or restricted that authority. All parties rely on the analysis of Justice Jackson, although plaintiffs argue that the President's acts fall within the third and narrowest category of authority, whereas defendants and the United States argue that his actions fall within the first and widest category of authority.

## PRESIDENTIAL CONSTITUTIONAL AUTHORITY

■ The power to conduct the foreign relations of the United States is vested in the President. Although this authority is not explicitly stated in the Constitution, it has been inferred from the enumerated powers of the President in Article II and from the constitutional structure of separation of powers. As such, the President has the authority to represent individual citizens in the international sphere.

This foreign affairs power of the President has been broadly construed by the Supreme Court. In *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the Court considered Presidential action pursuant to the Joint Resolution of Congress passed in May, 1934.

"*Resolved* ... That if the President finds that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco [in South America] may contribute to the reestablishment of peace between those countries, and if after consultation with the governments of other American Republics and with their cooperation ... he makes proclamation to that effect, it shall be unlawful to sell ... any arms or munitions ... to the countries now engaged in that armed conflict ..."

*Id.,* 229 U.S. at 312, 57 S.Ct. at 217.

On the same date, President Roosevelt issued a proclamation implementing the terms of the Resolution and prohibiting the sale of arms to Bolivia and Paraguay. The proclamation was revoked on November 14, 1935. Defendants later were indicted for selling arms to Bolivia. They argued that Congress had delegated its essential functions to the President and that the delegations were invalid. The Supreme Court discussed the President's authority in broad terms:

Whether, if the Joint Resolution had related solely to internal affairs, it would be open to challenge ... we find ... unnecessary to determine. The whole aim of the resolution is to affect a situation entirely external to the United States, and falling within the category of foreign affairs....

The two classes of powers are different, both in respect of their origin and their nature. The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary ... is categorically true only in respect of our internal affairs....

. . . .

... the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution....

Not only ... is the federal power over external affairs ... different from that

over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. . . .

*Id.*, 299 U.S. at 315–19, 57 S.Ct. at 218–20. This strong endorsement of the President's special role in the conduct of foreign affairs continues to be influential precedent. The opinion also considered the proper character of legislation in such circumstances:

If, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided . . . congressional legislation . . . must often afford to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.

. . . . .

*Id.*, 299 U.S. at 320, 57 S.Ct. at 221. The opinion then examined a series of broad delegations to the President of authority to act in foreign affairs. These include several examples of delegation of the power to blockade and embargo in his sole discretion.

■ The power of the President to conduct foreign affairs includes the power to represent United States nationals in their claims against foreign governments. As the American Law Institute stated: "[t]he President may waive or settle a claim against a foreign state based on the responsibility of the foreign state for an injury to a United States national, without the consent of such national." *Restatement (Second) of the Foreign Relations Law of the United States*, § 213 (1965) [hereinafter *Restatement*].

Claims settlements have been considered on numerous occasions by the courts. As long ago as 1801, the Supreme Court recognized the binding effect of such an agreement; the Court ordered that a ship, captured as a war prize and condemned by the lower courts, be returned pursuant to the provisions of an intervening treaty. *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 102, 2 L.Ed. 49 (1801). As Chief Justice Marshall stated:

In mere private cases between individuals, a court will and ought to struggle hard against a construction [of a law] which will, by a retrospective operation, affect the rights of parties, but in great national concerns, where individual rights, acquired by war, are sacrificed for national purposes, the [treaty] making the sacrifice ought always to receive a construction conforming to its manifest purpose; and if the nation has given up the vested rights of its citizens, it is not for the court, but for the government, to consider whether it be a case proper for compensation.

The President's right to settle claims of United States nationals has received continuing support from the courts. Yet, plaintiffs object that, even if the President may settle the claims of United States nationals without their consent, this power can only be exercised within the scope of his power to make treaties with the advice and consent of the Senate, U.S. Constitution, Article 2, § 2, cl. 2, and not by executive agreement.

■ Throughout our nation's history, the President has entered into numerous international agreements on many subjects without the advice and consent of Congress. These executive agreements have been a continuing source of friction between the President and the Congress. It is clear that the President has the authority to enter into executive agreements only pursuant to his own authority under the Constitution and pursuant to valid statutory delegations of authority. *See Restatement* § 120–21; Department of State Circular No. 175.

■ Just as clearly, certain international agreements may only be made as treaties. Yet the courts have never succeeded in delineating the line between what is within the treaty power and what is subject to executive agreement. Plaintiffs cite several cases which have found that specific executive agreements went beyond the President's authority. These involve attempts to avoid compliance with specific constitution-

al requirements by the use of an executive agreement, *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (executive agreement to subject overseas civilian dependents of United States armed forces personnel to military court-martials held to violate right to jury trial under Fifth Amendment), or attempts to regulate areas specifically allocated to the Congress by the Constitution, *United States v. Guy W. Capps, Inc.*, 204 F.2d 655 (4th Cir. 1953) (foreign commerce), *affirmed on other grounds* 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329 (1955).[6]

However, there is no need in these cases to draw such a line between the treaty power and the executive agreement power. This particular use of the executive agreement power has been affirmed both by the courts and by history. On two occasions, the Supreme Court has faced the issue of the validity of the settlement of claims by executive agreement. In 1933, the President, as part of the larger diplomatic process of recognizing the *de jure* status of the Soviet Russian government and exchanging ambassadors, entered into an executive agreement known as the Litvinov Assignment. In preparation for the eventual settlement of claims between the two countries,[7] the United States agreed to accept an assignment of Russian claims against property situated within the United States. This assignment was accomplished by an exchange of diplomatic notes between the President and the Soviet Commissar of Foreign Affairs, Litvinov. There was no statutory authority for such an executive agreement. Rather, it was entered into as a part of the President's recognition of the Soviet government. The President's power to recognize foreign governments is absolute and exclusive. *Guaranty Trust Co.*

*of New York v. United States*, 304 U.S. 126, 137–38, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938).[8]

In 1937, in *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), the defendant banker challenged the right of the United States to the assigned funds that he held. The Court recognized that the assignment was part of an overall settlement of claims of United States nationals against Russia. The settlement was an integral part of the recognition of the Soviet government. The Court reaffirmed that the President "had authority to speak as the sole organ of [the] government" with regard to this settlement. *Id.*, 301 U.S. at 330, 57 S.Ct. at 761. The Court therefore held that the Assignment was valid and that it superseded any claims arising out of state law.[9]

Most significantly, however, the Supreme Court upheld the power of the President to make a settlement pursuant to an executive agreement.

> The recognition, establishment of diplomatic relations, the assignment, and agreements with respect thereto, were all part of one transaction, resulting in an international compact between the two governments. That the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President may not be doubted.... The assignment and the agreements in connection therewith did not, as in the case of treaties ... require the advice and consent of the Senate.

*Id.*

The Supreme Court again considered the Litvinov Assignment in *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1941), finding that the executive agree-

---

**6.** The opinion of the Fourth Circuit also has been subject to criticism as being unrealistically broad, *Henkin, Foreign Affairs and the Constitution* 181–82 (1972).

**7.** Such a final settlement has never occurred.

**8.** Congress, however, did later recognize the Litvinov Assignment by providing that the funds so realized should be used to pay the

claims of United States nationals against Russia. Joint Resolution of August 4, 1939, 53 Stat. 1199.

**9.** Although the opinion in *Belmont* rests to some extent on considerations of Federalism, neither its analysis nor its impact were limited to that concern.

ment effectively superseded the outstanding attachments held by foreign creditors of a defunct Russian corporation. As the Court noted, the existence of unpaid claims of United States nationals against Russia had long been a barrier to the establishment of full diplomatic relations with Russia. Further, the claims settlement was a part of the overall agreement by which the diplomatic relations were established. Therefore, the Court held that the assignment to settle claims was proper. "Power to remove such obstacles to full recognition as settlement of claims of our nationals ... certainly is a modest implied power of the President ... Effectiveness in handling the delicate problems of foreign relations requires no less." *Id.*, 315 U.S. at 229, 62 S.Ct. at 565.

The circumstances of the Litvinov Assignment and the wording of the opinions in *Belmont* and *Pink* might suggest that the Presidential power to settle claims of United States nationals against foreign governments is limited to those situations in which the settlement is made in conjunction with the exclusive Presidential function of recognition of foreign governments. In considering the settlement of claims between the United States and Yugoslavia pursuant to executive agreement, the Second Circuit considered this exact question. In the words of Judge Learned Hand:

The constitutional power of the President extends to the settlement of mutual claims between a foreign government and the United States, at least when it is an incident to the recognition of that government; and it would be unreasonable to circumscribe it to such controversies. The continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations. The case at bar would be a particularly inept occasion to import into it an exception.... [E]ven though the Agreement of 1948 stood only upon the constitutional power of the

President to come to an accommodation with a foreign government upon mutual claims between the two nations, it would suffice ...

*Ozanic v. United States*, 188 F.2d 228, 231 (2d Cir. 1951).

This Presidential power to settle claims is supported by the long history of such settlements. The President has settled claims of United States nationals since the early days of the Republic. The process of settlement has taken two primary forms. The President may accept a lump sum payment from the foreign nation in full satisfaction of all claims of United States nationals against that government. The proceeds of such lump-sum settlements are then distributed through a domestic claims settlement mechanism. Presently, the International Claims Settlement Act of 1949, as amended, provides that the validity of all such claims shall be determined by a domestic International Claims Settlement Commission. 22 U.S.C. § 1623(a). This method has been used since at least 1802. Convention for Payment of Indemnities and Settlement of Debts (Great Britain-United States) (January 8, 1802) 8 Stat. 196. The lump-sum method has been especially popular since the Second World War. Most recently, it was used to settle United States claims against the People's Republic of China. United States-Peoples Republic of China Settlement, T.I.A.S. 9306 (1979).

The second method of claims settlement has been the establishment of an international claims tribunal to which all such claims are referred. *See, e. g.,* Agreement Concerning the Establishment of an International Arbitral Tribunal to Dispose of United States Claims Relating to Gut Dam (Canada-United States) (March 25, 1965) 17 U.S.T. 1566, T.I.A.S. 6114. Such arbitration settlements have been made by executive agreement. *E. g.,* Protocol of an Agreement Between the Secretary of State of the United States of America and the Plenipotentiary of the Republic of Venezuela for Submission to Arbitration of All Unsettled Claims of Citizens of the United States of America Against the Republic of Venezue-

la. (Venezuela-United States) (February 17, 1903) T.S. 420.

Thus, the power of the President to enter into settlements of claims against foreign governments, by executive agreement and resting solely on his constitutional authority, is well established. However, as in *Youngstown*, the history of legislation affecting this area should also be examined for Acts that affect the President's power.

## LEGISLATIVE ENACTMENTS

The Trading With the Enemy Act [TWEA], 50 U.S.C. App. § 5(b), from 1933 until 1977, gave the President vast powers to deal with war and national emergency. § 5(b) specifically provided:

(b)(1) During the time of war or during any other period of national emergency declared by the President, the President may ... by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and [any dealing in] gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property ... shall vest, when ... directed by the President, in such agency or person as may be designated ... and ... shall be held ... in the interest of and for the benefit of the United States ...

The TWEA was considered by the courts on numerous occasions during its long history. It was also invoked by many Presidents in many emergencies. After its 1933 amendment, the Act applied to any emergency declared by the President. During such a war or national emergency, the President could take action against any property of a foreign national. *United States v. Yoshida International Inc.*, 526 F.2d 560, 581 (C.C.P.A.1975).

In 1977, Congress substantially rearranged the powers provided to the President under the TWEA. It established a new act, the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* This Act covers "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). It further provides that each new emergency must be separately declared and separately dealt with. 50 U.S.C. § 1701(b). The TWEA, by the same Act, was limited to war-time situations. The legislation was a reaction to the use made by various Presidents of the TWEA to deal with wholly domestic emergencies, as well as the failure of Presidents to withdraw declarations of emergency when the emergency situation had long since passed. Thus, the legislation restricted the occasions when a President might use his emergency powers. He still has vast emergency powers during war-time under the TWEA. He has more limited powers during times of declared international emergencies under the IEEPA. He no longer has authority to deal with domestic emergencies during peacetime.

The IEEPA, however, did not significantly restrict the President's powers during international emergencies. Section 1702 of the IEEPA is, except for stylistic changes, a reenactment of the powers previously conferred on the President by § 5(b) of the TWEA. The only substantive change is the withdrawal of the power to vest assets in an Alien Property Custodian. That power is not sought in this instance and the change is therefore not significant here. Section 1702 provides:

(a)(1) ... the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest; by any person, or with respect to any property, subject to the jurisdiction of the United States.

■ The legislative history of this Act is sparse. However, the intent to give the President the broad powers previously exercised under the TWEA, albeit in fewer instances, is clear. Therefore, the substantial body of judicial interpretation of the TWEA should be applied to interpret the powers of the President under the IEEPA.

The purposes of the TWEA were threefold. It allowed the President to prevent a foreign government from acquiring dollars to use in a manner hostile to United States interests; to provide a pool of assets to compensate United States nationals for claims against the foreign government; and to use the funds to aid in negotiations with the foreign government. *Richardson v. Simon*, 560 F.2d 500, 505 (2d Cir. 1977).

The use of the President's powers under the TWEA to further a settlement of claims against a foreign government was specifically anticipated by the Courts.

the freeze of assets of a foreign country may ... promote ... meaningful planning ... by preserving the assets involved for possible use in some satisfaction of American claims against the country involved—perhaps by unilateral action of the United States, perhaps as part of a settlement with that country, a settlement that might include an agreement of that country to provide compensation to the [United States claimants].

*Nielsen v. Secretary of the Treasury*, 424 F.2d 833, 840 (D.C.Cir.1970).

The powers given to the President under the TWEA have been broadly construed. As the Court in *Nielsen* stated: "It may be reasonable and hence valid for a government to take more drastic measures in time of emergency, especially when they are reasonably limited in time, than it would propose or justify as permanent legislation." *Id.* at 843.[10] Further, the exercise of such powers was upheld as constitutionally valid.[11] Courts consistently refused to examine the propriety of declarations of emergency by the President. Further, such declarations of emergency were not limited to those affecting national security, but included economic emergencies[12] and domestic emergencies in peacetime.[13] This broad power to control foreign assets was used during numerous declared emergencies.[14]

---

**10.** *See also Propper v. Clark*, 337 U.S. 472, 481, 69 S.Ct. 1333, 1339, 93 L.Ed. 1480 (1949) ("The [President's] power [under TWEA] in peace and in war must be given generous scope to accomplish its purpose.")

**11.** *See Nielsen v. Secretary of the Treasury*, 424 F.2d 833, 839 (D.C.Cir.1970) (not an unconstitutional delegation of powers); *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 110 (2d Cir.1966) (same); *United States v. Yoshida Int'l Inc.*, 526 F.2d 560 (C.C.P.A.1975) (same).

**12.** *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 109 (2d Cir.1966); *United States v. Yoshida Int'l Inc.*, 526 F.2d 560, 579 (C.C.P.A.1975).

**13.** *Pike v. United States*, 340 F.2d 487 (9th Cir. 1965) (any peacetime emergency).

**14.** *E.g., Propper v. Clark*, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949) (Austrian assets blocked during World War II); *Orvis v. Brownell*, 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938

In addition to the power to block or freeze assets, which survives in the IEEPA, the TWEA gave the President the power to vest such blocked assets in a United States citizen or agency for use in the payment of claims of United States nationals. If such a vesting was ordered, the alien lost all rights in the vested property.[15] The President had the alternative power to grant licenses for the use of blocked or vested property. These licenses could include the release of portions of the property.[16] Absent such a license, the transfer of property rights in the blocked assets by judicial action was prohibited. *Propper v. Clark*, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949). This power to grant licenses was continued in the IEEPA.

In a series of cases, the Supreme Court considered the availability and status of attachments under the TWEA. The Supreme Court originally allowed such attachments under the TWEA even though no Presidential license had been issued for them. In *Zittman v. McGrath*, 341 U.S. 446, 457, 71 S.Ct. 832, 839, 95 L.Ed. 1096 (1951), the Court considered the rationale for allowing such attachments on blocked assets.

> The Custodian is charged, among other things, with preserving and distributing blocked assets for the benefit of American creditors. Few claims are not subject to some question, and the Treasury does not pay questionable claims. For those claims to be settled so that they can properly be paid out of blocked assets they must be adjudicated valid by some court of law. Because the debtor rarely is amenable to personal service, any action must be in the nature of a *quasi-in-rem* action preceded by an attachment of property belonging to the debtor within the jurisdiction of the court. If, as the Custodian now contends, the freezing program puts all assets of an alien debtor beyond the reach of an attachment, it is not difficult to see that there can be no adjudications of the validity of American claims, and consequently the claims, not being settled, would not be satisfied by the Treasury. The logical end of that course would be complete frustration of a large part of the freezing program. We cannot believe that the President intended the program to reach such a self-generated stalemate.

Thus, the attachments allowed in *Zittman* were allowed for two reasons of policy, neither of which is valid here. First, the attachments were necessary to allow adjudication of the validity of claims and thereby to aid the Alien Property Custodian in payment of valid claims out of the vested funds. However, since this settlement is not out of blocked funds distributed by a domestic agency, these attachments do not serve that purpose. The second, and closely related, reason for allowing the attachments in *Zittman* was that, at that time, the only means of obtaining personal jurisdiction over a foreign sovereign was an action *in rem*. However, since the passage of the Foreign Sovereign Immunities Act, considered below, that is not true in United States Courts. Therefore, although there is no need for this Court to decide the issue, there may no longer be any validity to the decision in *Zittman*.

Having allowed the attachments in *Zittman*, the Supreme Court was next faced with determining the status of such attachments in the face of a contradictory Presi-

---

(1953) (Japanese assets blocked during World War II); *Pike v. United States*, 340 F.2d 487 (9th Cir. 1965) (prohibition of gold possession and trading from 1933 to 1965); *Real v. Simon*, 510 F.2d 557 (5th Cir. 1975) (Cuban Assets Control Regulations, 31 C.F.R. § 515); *United States v. Yoshida Int'l Inc.*, 526 F.2d 560 (C.C.P.A.1975) (10% import duty surcharge to correct balance of payments deficit).

**15.** *Propper v. Clark*, 337 U.S. 472, 483–84, 69 S.Ct. 1333, 1340, 93 L.Ed. 1480 (1949); *Nielsen v. Secretary of the Treasury*, 424 F.2d 833, 840

(D.C.Cir.1970). Since the transfer of assets back to Iran did not divest the Iranians of title, nor did it give any title to the assets to the United States government, it cannot be termed a "vesting" and therefore is not prohibited by the enactment of the IEEPA. *Cf. EDS, supra*, 508 F.Supp. at 1361.

**16.** *Richardson v. Simon*, 560 F.2d 500, 502 (2d Cir. 1977); *Nielsen v. Secretary of the Treasury*, 424 F.2d 833, 845 (D.C.Cir.1970).

dential order. In *Orvis v. Brownell*, the Court was faced with a situation remarkably similar to these cases. An American company, Anderson, Clayton & Co. [Anderson], was indebted to Japanese nationals. The Japanese nationals, in turn, were indebted to various United States nationals, including Orvis. On June 14, 1941, President Roosevelt blocked all assets of Japanese nationals by Executive Order No. 8389. Orvis, and many others, brought suit against the Japanese nationals to recover on the debts that the Japanese owed them. Without obtaining licenses from the government, they obtained attachments against the funds held by Anderson for the Japanese nationals. Thereafter, a judgment was entered and plaintiff sought a license to have the judgment paid out of the attached funds. The license was refused and the judgment remained unsatisfied.

Several years thereafter, the Alien Property Custodian ordered the vesting of the funds and Anderson turned them over to the Custodian. The plaintiffs then sought to assert a property interest in the vested funds by their attachment and judgment.[17] The Court noted that such freezing orders did not prevent the issuance of attachments without licenses. The Court, however, was faced with the further issue of whether such an attachment and judgment created a property interest that could be enforced against the Custodian. The Court held that: "While [the freezing order] recognized attachment liens insofar as they determined relationships between creditor and enemy debtor, it did not permit the transfer of a property interest in the blocked funds which could be asserted against the Custodian." *Orvis v. Brownell*, 345 U.S. 183, 186–87, 73 S.Ct. 596, 598, 97 L.Ed. 938 (1953). The Court continued:

> To so interpret [the attachments] would ignore the express conditions on which

the consent was extended. Realistically, these reservations deprive the assent of much substance; but that should have been apparent on its face to those who chose to litigate. *The opportunity to settle their accounts with the enemy debtor was all that the permission to attach granted* .... Petitioners also contend that the Custodian was not given [the] power ... to "annul" liens and attachments. But the question is not whether a lien, concededly valid because obtained prior to the freezing order, may be "annulled" by the Custodian, but rather whether the freezing order prevented the subsequent acquisition, by attachment, of such a property interest as the Custodian would have to recognize under ... the Act. Because of the supremacy of the Federal Government on matters within its competence, the freezing order, while permitting an attachment for jurisdictional and other state law purposes, prevented the subsequent acquisition of a lien which would bind the Custodian ...

*Id.*, 345 U.S. at 187–88, 73 S.Ct. at 598–99 [emphasis added].[18] Therefore, unlicensed attachments and judgments cannot provide specific plaintiffs with an interest in frozen assets that will prevent the President from using them to satisfy claims of United States nationals generally.

The President has ordered a transfer of the assets back to Iran as part of a settlement of the Iran cases rather than a vesting to allow payment of United States claims domestically as in *Orvis*. Under the IEEPA, the President no longer has the power to order such a vesting. However, the breadth of the analysis in *Orvis* and in the other cases under the TWEA, as well as the legislative history of the IEEPA, suggest strongly that the courts should treat the transfer here with the same deference

---

17. Orvis relied on § 9 of the TWEA, which allowed the Custodian to return the property of United States nationals to them.

18. In light of the President's constitutional power to conduct foreign affairs and his powers under the TWEA, it seems apparent that

the phrase "the supremacy of the Federal Government on matters within its competence" referred to those powers of the Executive rather than to the Supremacy Clause of the U.S. Constitution, Article VI, cl. 2.

as the Supreme Court treated the vesting in *Orvis*.[19]

 The final legislative enactment of interest is the Foreign Sovereign Immunities Act of 1976. This Act had several express purposes.[20] The only purpose of interest in these cases was the transformation of actions against foreign sovereigns from *in rem* actions to *in personam* actions.[21] To do this, the FSIA provided, for the first time in United States jurisprudence, for the service of process directly on the foreign sovereign. It also restricted to a significant degree the ability of plaintiffs to attach assets of foreign sovereigns in actions before United States courts. 28 U.S.C. § 1609. After the enactment of the FSIA, plaintiffs no longer need to maintain these attachments to have jurisdiction over the foreign sovereign. The only exception for pre-judgment attachments is stated in § 1610(d):

> Immunity from [pre-judgment] attachment will be denied only if the foreign state . . . *has explicitly waived its immunity from attachment prior to judgment*, and only if the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state and not to secure jurisdiction. This subsection provides, in cases [of] . . . explicit waiver, a provisional remedy . . . to prevent assets from being dissipated or removed from the jurisdiction . . .

FSIA Legislative History at 6629 [emphasis added]. Thus, for the plaintiffs to maintain valid attachments pursuant to the FSIA, Iran must have explicitly waived its immunity from such attachments. Such a waiver, if any exists, is contained in the Treaty of Amity between the United States and Iran.[22] The Treaty of Amity provides in part:

> No enterprise of either [the United States or Iran] . . . shall, if it engages in commercial . . . activities within the territories of the other [country], claim or enjoy,

---

**19.** The language of *Orvis* suggests that either action taken by the President to settle claims will override the unlicensed attachments allowed in *Zittman*. Although the vesting in *Orvis* and the transfer here are different, each was among the President's emergency powers under the TWEA. Each also was intended to promote the eventual payment of claims of United States nationals. Blocking foreign assets to use them as a bargaining chip in dealing with a foreign government was as much a means of effectuating the purposes of the TWEA as was vesting the assets for later payment through a domestic agency. *See Nielsen v. Secretary of the Treasury*, 424 F.2d 833, 840 (D.C.Cir.1970). Therefore, either action, when taken to satisfy the claims of United States citizens in general, should override these plaintiffs' rights to unlicensed attachment.

The enactment of the IEEPA did not limit the President's ability to take actions adverse to unlicensed attachments. Congress specifically provided: "[n]othing in this act is intended . . . to impede the settlement of claims of U.S. citizens against foreign countries." S.R. Rep. No. 95–466, 95th Cong., 1st Sess. 6, *reprinted in* [1977] U.S. Code, Cong. & Ad. News, 4540, 4544.

**20.** The FSIA codified the existing body of decisional law of sovereign immunity. It made the determination of sovereign immunity more consistent by leaving that decision to the courts. The courts previously had relied on the advice of the State Department. The FSIA also provided, for the first time in United States jurisprudence, for the service of process on foreign sovereigns and for the maintenance of *in personam* actions against those sovereigns. This service has been applied in an alternative form in these cases. *Cf. New England Merchants National Bank v. Iran Power Generation and Transmission Co.*, 495 F.Supp. 73 (S.D.N.Y. 1980) (ordering alternative methods of service). Finally, the FSIA made certain exceptions to the longstanding rule that foreign sovereigns were absolutely immune from post-judgment execution on attachments. *See* Foreign Sovereign Immunities Act of 1976, H.R. Rep. 94–1487, 94th Cong., 2nd Sess. 7–8, *reprinted in* [1976] U.S. Code, Cong. & Ad. News 6604, 6605–06 [hereinafter FSIA Legislative History].

**21.** Prior to the enactment of the FSIA, the only means of suing a foreign government in United States courts was by an action *in rem*. FSIA Legislative History at 6612.

**22.** Despite the diplomatic breakdown between the two countries, it appears that this treaty is still in effect. *See* Vienna Convention of the Law of Treaties Art. 63 (May 23, 1969), *reprinted in* 63 Am.J. Int'l L. 875 (1969) ("The severance of diplomatic or consular relations between parties to a treaty does not affect the legal relations established between them by the treaty . . .").

either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

Treaty of Amity, Economic Relations, and Consular Rights, Art. XI, § 4 (United States-Iran) (August 15, 1955) 8 U.S.T. 899, 909, T.I.A.S. No. 3853. By this provision, Iran does explicitly waive its immunity from execution of judgment, but not its immunity from pre-judgment attachments.[23] The FSIA creates a strong presumption against such pre-judgment attachments. It would be an excessively liberal interpretation of the words "or other liability" in the Treaty of Amity to find that they properly waived the immunity from pre-judgment attachments. *New England Merchants National Bank v. Iran Power Generation and Transmission Co.*, 502 F.Supp. 120, 127 (S.D.N.Y.1980), *remanded for further consideration in light of settlement agreement*, 646 F.2d 779 (2d Cir. 1981).

 The final possible basis for the plaintiffs' right to these pre-judgment attachments comes from the Regulations issued pursuant to Executive Order 12170. These Regulations gave a specific license to plaintiffs to attach Iranian funds. 31 C.F.R. 535.418 (1980). This license, however, has been withdrawn by the Executive Orders issued since the settlement agreements. Clearly, the President has the authority to grant such licenses to attach. *See Orvis v. Brownell*, 345 U.S. 183, 185, 73 S.Ct. 596, 597, 97 L.Ed. 938 (1953) (recognizing the power of the President to grant licenses). Given the broad scope of the President's powers under the TWEA and the IEEPA, it would be anomalous indeed if the President could not revoke the licenses that he had previously granted.

As the discussion above has demonstrated, there are three possible bases for the maintenance of the attachments here. However, none of these grounds now supports the maintenance of the attachments. First, the courts allowed an implicit right to attach blocked funds under the TWEA in *Zittman v. McGrath*. *Zittman* may no longer be good precedent in light of the passage of the FSIA. More importantly, however, *Propper* and *Orvis* establish that such attachments will not stand in the way of the President's settlement of claims of United States nationals against the foreign government. Second, the FSIA grants a right to plaintiffs to attach the assets of a foreign government that has *explicitly* waived its immunity from such attachments. Iran, however, has not waived its immunity.[24] Finally, the President granted a conditional license to attach pursuant to his powers under the IEEPA. However, this license has been withdrawn. Therefore, there are no legal grounds on which these plaintiffs may continue to maintain these attachments and it is the duty of this Court to vacate the attachment orders.

## SEPARATION OF POWERS

Plaintiffs protest, however, that the President's actions violate the constitutional separation of powers in two ways. First, plaintiffs argue that the President's actions encroach on the powers of Congress. Plaintiffs cite a variety of cases, none of which involve situations such as this, and place principal reliance on language from *Myers v. United States*, 272 U.S. 52, 116, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926):

From this division on principle, the reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they are not

23. The waiver of immunities in the Treaty applies only to "enterprises" of Iran. Therefore, only certain of the defendants would have waived this immunity from pre-judgment attachment even if the treaty language were construed as constituting such a waiver.

24. The holding that the Treaty of Amity does not constitute an explicit waiver of immunity

from pre-judgment attachments under the FSIA makes unnecessary a consideration of the difficult issue of whether a Presidential settlement such as this would override valid attachments obtained pursuant to the FSIA. *Cf. Orvis v. Brownell*, 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938 (1953).

expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires.

The *Myers* case decided the issue of whether the President could remove a Presidential appointee, appointed with the advice and consent of the Senate, without obtaining that same advice and consent for his dismissal. Further, plaintiffs cite the case for the proposition that the President does not have the power to make international settlements by executive agreement. In the face of specific Supreme Court authority that he has such power, *Myers* is of little use.

*Youngstown*, not *Myers*, must be considered the leading authority on separation of powers in the area of the foreign affairs of this country. The President's actions here fall into the first category under Justice Jackson's analysis in *Youngstown*. The President has the clear authority to settle the claims of United States nationals against foreign governments. He may constitutionally exercise this power by executive agreement. His power to settle such claims is augmented by the Congressional delegation of further powers to control foreign assets during times of emergency.[25] In blocking Iranian assets and later in using those assets as part of a general settlement of differences with Iran, the President has acted properly within these combined powers.

Plaintiffs, however, suggest another separation of powers difficulty with the President's actions. They contend that his actions encroach on this Court's jurisdiction. They cite the line of authority starting with *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869) and *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), that poses the still unresolved issue of whether Congress may legislatively withdraw the jurisdiction of the inferior federal courts over a pending case. This Court need not venture into that thicket. For the President has not withdrawn the jurisdiction of the courts under the FSIA to try cases against foreign governments. Rather, the President has simply employed his independent, and well-established, power under the Constitution, to settle a particular set of outstanding claims against a foreign government. The FSIA does not purport to limit this constitutional power of the President and it must be construed to include that power. Once a claim has been settled, the exercise of this Court's jurisdiction over such a moot controversy is ended. However, settlement of a claim does not destroy the Court's jurisdiction over similar claims in the future. This objection, therefore, is without merit.

The objection does point out an area in which the President's actions do encroach on the powers of this Court. Although it is within the powers of the President to grant and withdraw licenses to attach blocked assets and it is also within his power to settle international claims, it is manifestly not within the President's powers to order this Court to implement such licenses or settlements in any particular manner. Rather, it is the duty of this Court, applying the Constitution and the law to cases before it, to decide whether an attachment has no basis in law and should be vacated or whether an action has been settled and should be stayed or dismissed accordingly. In this respect, the Executive Orders issued since the settlement with Iran encroach on

25. Implicit in the analysis of the President's constitutional powers to conduct United States foreign affairs is the issue of whether the power is exercised in a "foreign affairs" matter, *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–36 n. 2, 72 S.Ct. 863, 870–71 n. 2, 96 L.Ed. 1153 (1952). This is similar to the issue presented under the IEEPA of whether an emergency "has its source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a). Plaintiffs argue that these attachments are clearly domestic. However, the suits and attachments were brought in response to the Iran hostage situation and the breakdown of diplomatic and economic relations between the United States and Iran. Therefore, they are directly related both to foreign affairs and to a declared international emergency and are subject to the President's powers under the Constitution and the IEEPA. This Court need not decide whether there are situations in which the constitutional and IEEPA powers do not coincide.

the prerogatives of this Court. Thus, the President may constitutionally withdraw his license to attach these assets and he may seek an order of this Court vacating the attachments. However, he may not nullify the attachments independently of this Court's order.

## DUE PROCESS

 Plaintiffs also contend that the Presidential actions deprive them of their property rights without due process of law in violation of the Fifth Amendment. Plaintiffs' principal reliance is placed on language from *Gray v. United States*, 21 Ct.Cl. 340, 392–93 (Ct.Cl.1886): "Nevertheless, the citizen whose property is thus sacrificed for the safety and welfare of his country [by way of a settlement agreement with a foreign government] has his claim against that country; he has a right to compensation, which exists even if no remedy in the courts or elsewhere be given him."

The passage quoted from *Gray* is pure dicta. In *Gray*, the Court of Claims was charged with determining the validity of claims of United States nationals against France arising out of a period of hostility between the two nations. The United States had entered into a treaty with France in 1800 which waived all such claims. In 1885, Congress passed an Act to indemnify United States nationals for losses suffered as a result of the treaty. Congress further authorized the Court of Claims to determine the validity of such claims. However, it prohibited that Court from rendering a judgment on those claims. Thus, the decision of the Court of Claims was merely an advisory opinion to Congress. In that sense, the Court of Claims in *Gray* functioned much like the present International Claims Settlement Commission, 22 U.S.C. § 1623(a). Further, the language in *Gray* directly conflicts with the Supreme Court's notation in *United States v. The*

*Schooner Peggy*, 5 U.S. (1 Cranch) 102, 2 L.Ed. 49 (1802) that it is for the government, rather than the courts, to determine whether a loss caused by a claims settlement deserves compensation. After the decision in *Gray*, the Supreme Court reaffirmed this position in *Blagge v. Balch*, 162 U.S. 439, 457, 16 S.Ct. 853, 856, 40 L.Ed. 1039 (1896), when, in discussing *Gray*, it stated: "We think that payments thus prescribed to be made were purposely brought within the category of payments by way of gratuity,—payments as of grace, and not of right." No known cases actually have ordered compensation for such losses. *Restatement*, § 213, Reporter's Note.[26]

There is no proof that this settlement will result in any losses to the plaintiffs here.[27] The Declarations agreed to by the President specifically provide for an initial fund of one billion dollars. Iran will have no control over the establishment of the fund. Further, although the total of the outstanding claims of United States nationals against Iran exceeds this amount, the amount of judgments on these claims may not exceed it. For example, plaintiffs in *Security Pacific National Bank v. Government of Iran*, CV 79–4661–RJK, admit that the portion of their claims relating to syndicated bank loans has been settled. Similar bank loan settlements apply to many of the other suits around the country. In addition, experience with the same case indicates that that plaintiff, and perhaps many others, brought duplicate suits in various districts, all claiming the total amount in suit, solely to obtain attachment orders on Iranian funds situated in those districts. Therefore, there is a very real possibility that the total amount of claims is substantially in excess of the total judgments that will be rendered. Any contention of loss is thus premature. Further, in case of any loss, Congress may compensate plaintiffs by means of special legislation at a later date.

26. The case of *Seery v. United States*, 127 F.Supp. 601 (Ct.Cl.1955) is not to the contrary. It involved an attempt by the United States government to extinguish a claim *against itself* rather than against a foreign government.

27. Plaintiffs contend that there is no proof that the arbitration will ever take place. However, there has been progress toward the formation of the Tribunal. President Reagan has appointed the three United States members. Los Angeles Times, April 19, 1981, Part I, at 19, col. 3.

Even if plaintiffs are unable to satisfy their claims by means of the planned Arbitral Tribunal, and if the dictum in *Gray* is followed, plaintiffs will have a suit against the United States government and not against Iran. For the cases clearly hold that, whatever the plaintiffs' later right to compensation from our government, the President's settlement of claims with a foreign government, as against that foreign government, must be conclusive.

## DISPOSITION

 Having considered the merits of the President's actions, this Court is left with the disposition to be made of the cases before it. In one of the cases, *Hawaiian Agronomics Co. (International) v. Government of Iran*, CV 79–4875–RJK, plaintiff contends that, whatever the impact of the President's actions, its claim is outside the scope of the Declarations and should proceed in this Court. Plaintiff asserts that it was incorporated in 1958 under the laws of Liberia. Its principal place of business has been in Hawaii throughout its existence. It was owned from 1958 to 1979 by a Hawaiian corporation. In September, 1979, prior to the declaration of emergency by the President, the company was sold to a Swiss corporation. In 1980, it was resold to a Hawaiian corporation.

Plaintiff argues that its claim therefore does not come within the jurisdiction of the Arbitral Tribunal. The Settlement Declaration, which established the Arbitral Tribunal, gave the Tribunal jurisdiction over "claims of nationals of the United States against Iran." Settlement Declaration, Article II. The term "claims of nationals" is defined by the Settlement Declaration as:

claims owned continuously, from the date on which the claim arose to the date on which this agreement enters into force, by nationals of that state, including claims that are owned indirectly by such nationals through ownership of capital stock or other proprietary interests in juridical persons, provided that the ownership interests of such nationals, collectively, were sufficient at the time the

claim arose to control the corporation or other entity, and provided, further, that the corporation or other entity is not itself entitled to bring a claim under the terms of this agreement.

Settlement Declaration, Article VII. The plaintiff in *Hawaiian Agronomics* is not entitled to bring a claim before the Tribunal on its own behalf since it is not organized under the laws of the United States. However, the parent corporation of plaintiff is a United States corporation and therefore would be entitled to bring such a claim. Plaintiff argues that the change in its ownership places it beyond the jurisdiction of the Tribunal because it was not owned continuously by Americans.

Defendants in *Hawaiian Agronomics* argue that, since the Tribunal has been given the competence to determine its own jurisdiction over specific cases, this case should be ordered transferred to the Tribunal with leave to plaintiff to reopen its action before this Court should the Tribunal find that it does not have jurisdiction. Before transferring any uncertain cases, however, this Court should require defendants to make a preliminary showing that there are facts upon which the Tribunal might find that the cases are within its jurisdiction. The parties also should be given leave to take discovery for the purposes of determining the facts underlying this jurisdictional issue. *Cf. Data Disc Inc. v. Systems Technology Assoc. Inc.*, 557 F.2d 1280 (9th Cir. 1977).

 With regard to the disposition of the other cases, plaintiff in *Security Pacific National Bank v. Government of Iran*, CV 79–4661–RJK, takes the position that an alternative order to effectuate the Executive Orders should be issued. It objects to vacating the attachments and to the proposed dismissal. It indicates that the major portion of its claims are settled and that it is presently negotiating to settle the balance of the claims. It proposes an alternative order that would stay the actions pending the arbitration proceedings and would only vacate the attachments when the Department of the Treasury seeks sanctions

for failure to do so. It relies on the provisions of the new Regulations, 46 Fed.Reg. 14330, 14335 (1981) (to be codified in 31 C.F.R. 535.221(b)), that the government will not seek such sanctions until the Executive Orders have "been the subject of a definitive legal ruling . . ."

Security Pacific argues that this action should be stayed because a dismissal without prejudice would terminate the rights of the plaintiffs. It also argues that dismissal is inappropriate because it would require the vacating of the attachments.

This argument has several flaws. First, the issue of continuing the attachments is legally separate from the issue of a stay or dismissal for these actions. The attachments can only continue in force if there is a legal basis for them. Yet, plaintiffs seek to maintain the attachments until the government seeks sanctions for failing to make the required transfer of funds. In effect, plaintiff asks this Court not to rule on the legal basis for the attachments until there has been a definitive legal ruling. Such a definitive ruling can only be made by a court presented with the issues that are presented here. If the issues are ever to be conclusively settled by the Courts before the entire settlement agreement falls apart, this Court must act now.

Second, the issue of a stay or dismissal of these actions is clearly within the discretion of this Court to control its own docket.[28] The plaintiffs in these actions have shown little interest in prosecuting these suits. Indeed, much of the action in these cases has been taken only under threat of dismissal by this Court for lack of prosecution. Further, if the claims presented here are adjudicated by the Arbitral Tribunal, any further proceedings before this Court will be wholly superfluous. The disadvantages to plaintiffs of a dismissal without prejudice can be easily ameliorated by careful shaping of the Order of this Court.

The dismissal will be both without prejudice and with specific leave to move to reopen should the arbitration process not reach a final judgment on these claims.

The dismissal and vacating of attachments will be ordered immediately but these orders will be stayed until July 19, 1981. This is the date by which the United States is obligated to have transferred all of the frozen assets to the security account in the Bank of England. See General Declaration, Paragraph 6. This stay will allow continued settlement negotiations until that date. It will also allow plaintiffs time to appeal the decision of this Court without suffering any prejudice due to an interim vacating of the attachments. To promote such an appeal and to resolve jurisdictional questions, this Court will also certify its decision for immediate appeal.

Accordingly, it is hereby ORDERED:

In CV 79–4661–RJK, CV 80–0175–RJK and CV 80–0524–RJK:

1. The attachments are VACATED as without further legal basis.

2. The actions are DISMISSED WITHOUT PREJUDICE subject to the right of any party to move to reopen the action at any time prior to the entry and satisfaction of a judgment of the Arbitral Tribunal. This motion to reopen shall be on the grounds that the settlement has failed of its essential purpose.

3. Both the vacating of the attachments and the dismissal are STAYED until July 19, 1981.

4. To the extent that the decision of this Court is not a final and appealable order, the issue of the validity of the agreement and the Executive Orders is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on the grounds that it is a controlling question of law as to which there is substantial ground for difference of opinion and that the immediate appeal of this order will materially advance the termination of this litigation.

In CV 79–4875–RJK:

1. The parties are given leave to take such discovery as they deem necessary to determine whether the claim in issue is within the terms of the settlement agreement.

---

**28.** *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).

2. The parties shall file points and authorities regarding this issue not later than May 22, 1981.

3. The matter is placed on calendar for hearing on June 1, 1981, at 10:00 a. m. At the hearing, to the extent that the facts are in dispute, the parties shall be allowed to present testimony and other evidence.

4. The Court then will determine whether the above orders in the other cases also will be applied to this case.